MALESHA COGDELL, AN INFANT BY HER GUARDIAN AD LITEM, RUTH COGDELL, AND RUTH COGDELL, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS, v. HOSPITAL CENTER AT ORANGE, EDWARD HEALY, ADMINISTRATOR, ARTHUR DUNN, PRESIDENT, L. CHARLES JONES, M.D., AND MARGARET ANN HIGGENS, R.N., DEFENDANTS-APPELLANTS, AND ROSARIO P. FERNANDO, M.D., ALAN T. PINDERHUGHES, M.D., LILIA RIVERA, R.N., JOHN DOE (FICTITIOUS NAME), RICHARD ROE (FICTITIOUS NAME), JOHN SMITH (FICTITIOUS NAME), RICHARD JONES (FICTITIOUS NAME), JOHN BROWN (FICTITIOUS NAME), MARY WHITE (FICTITIOUS NAME), JANE DOE (FICTITIOUS NAME), MARY SMITH (FICTITIOUS NAME), JANE BLACK (FICTITIOUS NAME) AND KAREN ROE (FICTITIOUS NAME), DEFENDANTS.

Argued November 28, 1988—Decided July 24, 1989.

---

*John J. Francis, Jr.,* argued the cause for appellants (*Shanley & Fisher,* attorneys; *Michael D. Quinlan,* on the brief).

*Carol L. Forte* argued the cause for respondents (*Blume, Vazquez, Goldfaden, Berkowitz, Oliveras & Donnelly,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case, Ruth Cogdell, while under the care of Dr. Brown, an obstretrician, gave birth by an emergency cesarean section. The baby suffered permanent injuries at or shortly after her birth. She was diagnosed as having cerebral palsy of the severest spastic quadriparetic type with microcephaly and

mental retardation.[1] Mrs. Cogdell instituted a lawsuit on her own behalf, and as guardian ad litem, on behalf of her child, against Dr. Brown, and later against Dr. Snead, the emergency-room pediatrician. No other parties were named as defendants. Plaintiff's theory of the case was that the child's injuries were caused by Dr. Brown's negligent delay in deciding to perform the cesarean section and were further aggravated by improper resuscitation efforts by Dr. Snead.

The case was tried to conclusion, with the jury returning a verdict in favor of both defendants. Plaintiff then filed a notice of appeal. The appeal was dismissed in an unpublished opinion, the court concluding that it was barred under the terms of a settlement agreement that had been reached by the parties during the jury deliberations. Challenging only the issue of the preclusive effect of the settlement agreement, plaintiff filed a petition for certification to this Court, which was denied. 114 *N.J.* 517 (1989).

While the appeal was pending, plaintiff commenced a second action against the hospital, members of the operating team, and several hospital administrators. In this case, she alleged that the delay in performing the cesarean section, and the infant's resultant injuries, were caused by the negligence of these defendants in assembling the operating team necessary to assist in the delivery. The defendants moved to dismiss the action asserting that the entire controversy doctrine mandated their joinder as parties in the earlier action and therefore the current lawsuit against them was barred. Their motion was denied. Defendants then moved for leave to appeal, which was denied by the Appellate Division. Defendants filed a petition

---

[1]Cerebral palsy is "a congenital form of impairment of neurologic and muscular function caused by a faulty development of certain parts of the brain (which are concerned with movement) or by birth injuries to the brain." Schmidt, Attorneys' Dictionary of Medicine (1989). Malesha Cogdell's cerebral palsy included paralysis of her four limbs, abnormal smallness of the head and brain, and mental retardation.

for certification, which this Court treated as a motion for leave to appeal and granted. 110 *N.J.* 519 (1988).

## I.

The first action, *Cogdell v. Brown*, 220 *N.J.Super.* 330 (App. Div.1987), was brought by plaintiff against only the obstetrician and pediatrician on the theory that these doctors were guilty of professional negligence that caused the infant's serious injuries. Evidence of such negligence was suggested by the information disclosed in separate reports prepared by plaintiff's two expert medical witnesses. The first was submitted by Dr. Mandelman in July 1984, who after noting that the patient was obviously and appropriately prepared for a cesarean section before Dr. Brown arrived, concluded that Dr. Brown's delay in starting the operation was "exceedingly prolonged and ... blatantly deviant." In his opinion, the delay from the arrival of the patient on the labor floor to the time of delivery constituted a "deviation from good and accepted medical practice ... [and] this delay ... is the substantial cause of the Cogdell infant's present state." [2] The second report, dated March 1985, prepared by Dr. Klaven, reached a similar conclusion.[3]

---

[2]Dr. Mandelmam's report stated:

> In short, with Dr. Brown's arrival and evaluation at 9:30, surgery and delivery should have taken place very shortly. There is absolutely no statement as to stable or healthy fetal status at this time.... The 7:40 to 10:55 p.m. delay in the start of this operation is exceedingly prolonged and is blatantly deviant.... The 18 minute delay from the start of the C-section to the infant delivery is equally incredulous.

[3]This expert noted that Ruth Cogdell was put on an external fetal monitor for fetal surveillance from 9:15 p.m. to 10:30 p.m. The external fetal monitor findings indicated that both immediate intervention was necessary and that vaginal delivery would not occur in this case. As a result, this expert concluded:

> The delay in delivery to 11:13 was a deviation from the accepted standard of obstetrical care which contributed significantly to the perinatal hypoxia substained by Malesha Cogdell and the damages that she manifests today.

Dr. Brown contended that he had not deviated from the accepted standard of medical care. Nevertheless, during his deposition in May 1985, Dr. Brown testified that there had been a delay in performing the cesarean section because of difficulty in assembling the operating team. Specifically he testified that he made the decision to perform an emergency cesarean section shortly after seeing Ruth Cogdell around 9:30 p.m. and began to assemble the required surgical team at that time. Dr. Brown could not "recall" how long it took the anesthesiologist or the pediatrician to arrive at the hospital but that "[t]here was a significant delay between the time of the decision that the cesarean was made and the time it was actually done, and we had to assemble the team, getting the nurses in and all that. That caused some problems." The evidence also revealed that the operation did not commence until approximately 11:00 p.m.

The plaintiffs then deposed all members of the operating team, along with Dr. Jones, the Chairman of the OB/GYN Department, between August and December 1985. The anesthesiologist and two operating nurses were relatively unspecific about their recollection of any delay in their own responses to the request to come to the hospital to perform the delivery. Similarly, in his deposition, Dr. Snead, the pediatrician, was unspecific about any delay but recalled no difficulty in arriving at the hospital that night. Dr. Jones did not indicate whether there was a delay in this case, although his testimony suggested there was probably none.

Nevertheless, there was additional evidence relating to the delay in undertaking the operation. A second obstetrician, Dr. Pinderhughes, in his deposition in October 1985, said that in reviewing the hospital records he observed that "it appears that there may have been a delay" in the delivery of the baby, although he did not explain the delay; moreover, he knew of no policy that set forth a time constraint for doing emergency cesarean sections in 1982. Further, in February 1986, Dr. Brown submitted a second report by another expert witness, Dr. Greenwald. After examining the hospital records, the

reports of other expert witnesses, the plaintiff's and the defendants' answers to interrogatories, and Dr. Brown's and Ruth Cogdell's depositions, this expert reached the conclusion that there was delay attributable to the hospital and its staff.[4]

The trial occurred in June 1987. The plaintiff proceeded only on the theory that the doctors were negligent. Dr. Brown was assertedly negligent because he did not decide to do a cesarean section immediately on arrival and he delayed in calling a surgical team together while he tried to induce natural labor. Plaintiff attempted to show that there was a period between Dr. Brown's initial examination and the time that the decision to operate was made. Plaintiff cross-examined Dr. Brown at length on whether he had initially tried to induce labor instead of making an immediate decision to operate to show that the delay was negligent. However, there was some indication that there were additional reasons for the delay. In plaintiff's cross-examination of Dr. Jones, he testified, contrary to his deposition and direct testimony, that there were problems assembling delivery teams at the hospital and that, on occasion, it took more than one hour to assemble an operating team.

As noted, following the jury's verdict in favor of defendants, plaintiff brought a second action against the hospital and its

---

[4]Dr. Greenwald's report stated:

Operating personnel and anesthesiologist were not in-house and immediately available to perform emergent cesarean section. It appears that Dr. Brown attempted to summon necessary personnel in a timely and appropriate manner. There is a prolonged delay in availability of personnel necessary to perform cesarean section, resulting in delay in performance of surgery for approximately 1½ hours after the decision was made to perform emergency cesarean section. Had the operating room team been immediately available, cesarean birth could have been completed in a timely and appropriate manner.

Although sources of the delay are not apparent from data presently available for my review, it can be stated that The Hospital Center at Orange breached standard medical care by failing to have an operating room team immediately available to perform cesarean section within ½ hour after the decision to do so.

staff, the subject of this appeal. She charged these defendants with negligence in causing the delay that prevented the timely performance of the cesarean delivery with the resultant injuries to the newborn. Defendants contended that plaintiff knew at least two years before the first lawsuit was tried that Dr. Brown blamed the hospital for the delay in arranging for the cesarean section; moreover, plaintiffs had ample opportunity to amend their complaint to join the hospital and its responsible staff personnel as party-defendants when they added Dr. Snead in May 1986 as a defendant. As a result, plaintiffs should not be allowed "a second bite at the apple." Defendants argued without success that under these circumstances the entire controversy doctrine required such joinder and that the failure to join bars this second lawsuit based on essentially the same legal controversy.

## II.

The issue on appeal is whether plaintiff was required to have joined as party-defendants the hospital and its staff in its original action against the obstetrician and pediatrician, and, if so, whether the failure to join these defendants operates as a bar to a second independent action against them. We are directed in the first instance to our Rule of practice, *Rule* 4:28–1(a), which governs the joinder of parties in New Jersey. It provides in part:

> A person who is subject to service of process shall be joined as a party to the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest in the subject of the action and is so situated that the disposition of the action in his absence may either (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of his claimed interest.

This rule of mandatory joinder is not self-defining. Its provisions, however, do not suggest it would mandate joinder of these current defendants. Under the Rule's literal language, plaintiff and the defendants in the prior action could have

secured complete relief between themselves without the current defendants. *R.* 4:28–1(a)(1). Nor is it apparent that the absence of the current defendants left them unable to protect their interest, their ability to disprove allegations of their own negligence, or adversely affected the obligations of any of the parties in the earlier action. *R.* 4:28–1(a)(2)(i), (ii).

In addition to the party-joinder Rule, *Rule* 4:5–1, is a pleading Rule that requires that if there is another pending action involving the same cause of action, the parties in that other action must be identified.[5] The Rule also requires the identification of "any other party who should be joined" without, however, otherwise defining this obligation. The Rule also contemplates that if during the litigation a person is discovered who might be required to be named, then the plaintiff should notify the court and parties, and the court itself might compel joinder. The Rule does not specify grounds for joinder nor does it indicate that a failure to notify under those circumstances will have any preclusionary effect.

*Rule* 4:5–1 was adopted following the decision of this Court in *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336 (1984). There, we determined that the entire controversy doctrine could bar an independent action against a party whose interest in that action was the same as that in a pending action but who had not been joined in the pending action. *Crispin,* however, did not

---

[5]*Rule* 4:5–1 provides in part:

Each party shall include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other action or arbitration proceeding is contemplated; and, if so, the certification shall identify such actions and all parties thereto. Further, each party shall disclose in the certification the names of any other party who should be joined in the action. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification. The court may compel the joinder of parties in appropriate circumstances, either upon its own motion or that of a party.

directly address the issue of whether the failure to join such a party in an action, once that action has been concluded, can serve to bar a subsequent litigation against that party involving the same legal controversy. This case poses that situation, and we are impelled to consider again the underlying policies of the entire controversy doctrine.

The entire controversy doctrine embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy. *See* Comment, *The Entire Controversy Doctrine: A Novel Approach to Judicial Efficiency,* 12 *Seton Hall L.Rev.* 260 (1982). The doctrine has become such a fundamental aspect of judicial administration, it has achieved constitutional confirmation. Article 6, section 2, paragraph 4 of the 1947 Constitution states:

> Subject to rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief should be granted in any cause so that all matters in controversy between the parties may be completely determined.

The purposes of the doctrine include the needs of economy and the avoidance of waste, efficiency and the reduction of delay, fairness to parties, and the need for complete and final disposition through the avoidance of "piecemeal decisions." 2 State of New Jersey Constitutional Convention of 1947, Committee on the Judiciary Report § II(J), at 1187 (1947). The entire controversy doctrine has evolved "to eliminate delay, prevent harassment of a party and unnecessary clogging of the judicial system, avoid wasting the time and effort of the parties, and promote fundamental fairness." *See Barres v. Holt, Rinehart and Winston, Inc.,* 74 *N.J.* 461, 465 (1977) (Schreiber, J., dissenting).

The doctrine has served the ends of justice both before and since its constitutionalization. *See, e.g., Carlisle v. Cooper,* 21

*N.J.Eq.* 576, 579 (E. & A.1870) (equity courts could interfere with nuisance actions brought in law courts "on the ground of restraining irreparable mischief, or of suppressing interminable litigation, or of preventing [a] multiplicity of suits."); *Smith v. Red Top Taxicab Corp.*, 111 *N.J.L.* 439, 440–41 (E. & A.1933) ("[n]o principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon."); *Mantell v. International Plastic Harmonica Corp.*, 141 *N.J.Eq.* 379, 393 (E. & A.1940) (equity court can render "final determination of the entire controversy" including establishing legal rights and granting legal remedies; the rationale of the rule is "the policy of avoiding 'a multiplicity of suits.' ").

Since its constitutional codification, the doctrine has continually evolved through the common-law so that it currently encompasses a mandatory rule for the joinder of virtually all causes, claims, and defenses relating to a controversy between the parties engaged in litigation. Thus, in *Steiner v. Stein*, 2 *N.J.* 367, 378 (1949), the Court ruled that the Chancery Division should adjudicate the legal issues of a case even if the equitable issues have been determined. This conclusion was reinforced by *Tumarkin v. Friedman*, 17 *N.J.Super.* 20, 24 (App.Div. 1951), where Justice Jacobs, then sitting on the Appellate Division, decided that the county court had full authority to hear the whole dispute (legal and equitable issues) when a complaint within its jurisdiction is properly filed. *See also O'Neill v. Vreeland*, 6 *N.J.* 158, 169 (1951) (same); *State v. Jones*, 4 *N.J.* 374, 383 (1950) (same). The Court in *Massari v. Einsiedler*, 6 *N.J.* 303, 313 (1951), went further and ruled the entire controversy doctrine includes the joinder of defenses. This was restated in *Garrou v. Teneck Tyron Co.*, 11 *N.J.* 294, 305 (1953), where it was decided that the joinder of an equitable claim for injunction with a claim in lieu of prerogative writ was "well within the farsighted provisions of the rules and will serve the ends of sound judicial administration by curbing the inconvenience, delay and expense incident to independent tri-

als." *See also Applestein v. United Board & Carton Corp.,* 35 *N.J.* 343, 356 (1961) ("a defendant must assert all matters which will defeat a claim against him and a plaintiff must seek complete relief for vindication of the wrong he charges.").

The Court through Justice Brennan in *Ajamian v. Schlanger,* 14 *N.J.* 483, 488 (1954), specifically broadened the entire controversy doctrine to include not only defenses but affirmative claims that could, and should, be brought as counterclaims; the failure of such mandatory joinder would preclude a party in a subsequent lawsuit from asserting a "new and independent action for damages." In *Vacca v. Stika,* 21 *N.J.* 471, 476 (1956), the Court moved even closer to making the entire controversy doctrine encompass all claims and causes, by extending its reach to include representative parties necessary for the presentation and resolution of such claims. *See also Korff v. G and G Corp.,* 21 *N.J.* 558, 571–72 (1956) (entire controversy doctrine extended to allow defendant to bring counterclaim against nonresident plaintiff who voluntarily instituted a lawsuit in New Jersey).

This policy of comprehensive joinder was codified in 1979, when *Rule* 4:27–1(b) was adopted requiring the mandatory joinder in a pending litigation of any claims that would be required "by application of the entire controversy doctrine."

The party-joinder Rule, *Rule* 4:28–1, has not travelled as far as the claims-joinder Rule. Nevertheless, both Rules reflect a common policy, suggesting that the joinder Rules are not only conceptually similar but are procedural twins. Further, though codified by Rule, they both embrace the dynamics of the common-law. Indeed, just as the claims-joinder rule, *Rule* 4:27–1, expressly incorporates the common-law entire controversy doctrine, the party-joinder Rule in its ongoing development reflects its common-law origins and nature.

The policy behind the party-joinder Rule generally encompasses both fairness to parties and judicial efficiency and economy. Thus, the Rule tries foremost to protect an absent person

from an adjudication of his or her interests; it also protects all of society from repetitious, abortive, and wasteful litigation. *See* Fink, "Indispensable Parties and the Proposed Amendment to Federal Rule 19," 74 *Yale L.J.* 403, 405–06 (1965); Reed, "Compulsory Joinder of Parties in Civil Actions," 55 *Michigan L.Rev.* 327, 330, 338 (1957). This policy has been expressed with remarkable consistency throughout the evolution of the rule. *See, e.g., The Board of Commr's of Somerville v. Johnson,* 36 *N.J.Eq.* 211, 214 (Ch.1882); J. Story, *Commentaries on Equity Pleadings* 74 (19th ed. 1892); Schnitzer and Wildstein, *N.J. Rules Service* Annotations and Comments, *R.* 4:32–1, A IV–953, 955.

The party-joinder rule at common law required mandatory joinder of parties deemed to be "indispensable." Such a party is one who "has an interest inevitably involved in the subject matter before the court and a judgment cannot justly be made between the litigants without either adjudging or necessarily affecting the absentee's interest." *Allen B. DuMont Laboratories, Inc. v. Marcalus Mfg. Co.,* 30 *N.J.* 290, 298 (1959); *see MacNeil v. Ann Klein,* 141 *N.J.Super.* 394, 406 (App.Div.1976); *Jennings v. M & M Transp. Co.,* 104 *N.J.Super.* 265, 272 (Ch.Div.1969). Under our own joinder practice, party fairness is viewed from the vantage of current parties as well as those who are absent. Pressler, *Civil Practice Rules,* Comment on *Rule* 4:28–1, at 914 (1989).

The party-joinder rule is concerned with the completeness, soundness, and finality of the ultimate determination of a legal controversy. It has long been recognized that joinder is designed "to make perfectly certain that no injustice is done, either to the parties before it, or to others, which might otherwise be grounded upon a partial view only of the real merits." J. Story, *Commentaries on Equity Pleadings, supra,* at 74. "The completeness of a decree, its effectiveness in binding all of those with an interest in the subject matter, was the primary operative consideration in determining mandatory joinder issues at equity." Lewis, "Mandatory Joinder of Par-

ties in Civil Proceedings: The Case for Analytical Pragmatism," 26 *U. of Fla.L.Rev.* 381, 384 (1974). As stated in one New Jersey opinion, "when the court undertakes to settle a question at issue [in equity] it should do so effectively and permanently by bringing before it all parties necessary for that purpose." *Garnick v. Serewitch,* 39 *N.J.Super.* 486, 497 (Ch.Div.1956) (citing *Callahan v. Federal Trust Co.,* 126 *N.J.Eq.* 311 (E. & A.1939); *Broad Street National Bank v. Holden,* 109 *N.J.Eq.* 253 (Ch.1931)); *see Graham v. Zimmerman,* 181 *Conn.* 367, 435 *A.*2d 996, 1000 (1980).

Courts have recognized that in achieving the complete and final disposition of litigation " '[t]here is no prescribed formula for determining in every case whether a person or corporation is an indispensable party or not,' " and that "[e]ach case must depend upon its own facts and circumstances." *Garnick v. Serewitch, supra,* 39 *N.J.Super.* at 496 (quoting in part *Niles–Bement–Pond Co. v. Iron Moulders' Union,* 254 *U.S.* 77, 41 *S.Ct.* 39, 41, 65 *L.Ed.* 145 (1920)). Indeed, in defining a party as "indispensable," the Supreme Court in *Shields v. Barrow,* 58 *U.S.* 130, 139, 17 *How.* 130, 139, 15 *L.Ed.* 158, 160 (1854), included a person whose "interest in the controversy" is "of such a nature that a final decree cannot be made without ... leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Under our own party-joinder Rule, *Rule* 4:28–1, "whenever feasible, the persons materially interested in the subject of an action ... should be joined as parties so that they may be heard and a complete disposition made." Pressler, *Civil Practice Rules, supra,* at 912 (quoting Advisory Committee's Note on Fed.R.Civ.P. 19).

The purposes that have stimulated the growth of the claims-joinder rule, which has historically been equated with the entire controversy doctrine, are similar, if not identical, to those of the party-joinder rule. These goals are a recurrent refrain in the judicial explication of the doctrine, *see, e.g., Ajamian v. Schlanger, supra,* 14 *N.J.* at 485; *Massari v. Einsiedler, supra,* 6 *N.J.*

at 307, 313; *Steiner v. Stein, supra,* 2 *N.J.* at 377; *Tumarkin v. Friedman, supra,* 17 *N.J.Super.* at 25–26, as is the repeated concern for party fairness, *see William Blanchard Co. v. Beach Concrete Co., Inc.,* 150 *N.J.Super.* 277, 297 (App.Div.) ("withholding [component of a controversy] is by definition unfair if its effect is to render the pending litigation merely one inning of the whole ball game."), certif. denied, 75 *N.J.* 528 (1977).

Nevertheless, traditionally the party-joinder rule differentiated "indispensable" parties from other persons whose participation in litigation was deemed only "necessary" or "proper." [6] Thus, the mandatory joinder of "necessary" parties—those with only a material, albeit separable, interest in a controversy—in a single action has not generally been recognized as a constituent part of the entire controversy doctrine. *See, e.g., McFadden v. Turner,* 159 *N.J.Super.* 360, 369 (App.Div.1978) (because "entire controversy doctrine [i]s a rule of mandatory joinder of claims, not of parties," plaintiff permitted to sue hospital nurses for injuries sustained under their care when he had already, in a previous lawsuit, won a jury verdict for those same injuries against the hospital on the theory of respondeat superior); *see also Aetna Ins. Co. v. Gilchrist Bros.,* 85 *N.J.* 550, 558 (1981) ("the preclusive effect of nonjoinder of claims arising out of a single dispute or wrong between the parties may not automatically be applied to a failure to join a person as a party to the action.").

We perceive, nonetheless, that the commonality of purposes in both the party-joinder and claims-joinder rules indicates that they are conceptual subsets of the entire controversy doctrine.

---

[6]The Supreme Court in *Shields v. Barrow, supra,* 58 *U.S.* at 139, 17 *How.* at 139, 15 *L.Ed.* at 160, describes a "necessary party" as

[p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it.

This explains their parallel, albeit uneven, development. Thus, even while eschewing an extension of the party-joinder rule, the court in *McFadden v. Turner, supra,* 159 *N.J.Super.* 360, saw several advantages in mandatory joinder of a necessary or proper party and recognized that the non-mandatory joinder of such parties ran counter to the purposes of the entire controversy doctrine. *Id.* at 371. The court also observed that "extraordinary circumstances may inhere in particular party and claim relationships which require joinder of otherwise separate claims by separate litigants." *Id.* at 371 n. 2. The dissent by Judge Bilder, who would have barred the second lawsuit without any new Supreme Court precedent, expressed the view that the extension of the entire controversy doctrine to this situation was compelled "by both logic and the basis for the Doctrine." *Id.* at 372–73.

Similarly, the Court in *Vacca v. Stika, supra,* 21 *N.J.* 471, saw the need for the comprehensive and conclusive judicial disposition of a litigated controversy. There, the plaintiff sued on very narrow grounds to obtain a building permit. The Court indicated that additional parties should be joined, finding that "this case presented a controversy which could not by any stretch of the imagination be resolved completely as to all concerned simply by an action in lieu of prerogative writ to compel the borough clerk to issue the license." *Id.* at 475. Justice Schreiber in *Aetna Ins. Co. v. Gilchrist Bros., supra,* acknowledged that consistent with the goals of the entire controversy doctrine "under some circumstances the failure of a party to be joined or to intervene in a prior action should, after adjudication, bar a second action against that party involving the same subject matter." 85 *N.J.* at 556. In *Newmark v. Gimbel's Inc.,* 54 *N.J.* 585 (1969), the Court decided that it might be best for products-liability lawsuits to join both defendant manufacturer and retailer in one action. It stated:

> Considering the overall problem of prosecuting products liability cases, it would seem to make sense procedurally to have the plaintiff's cause of action whenever possible adjudicated in one action against manufacturer and retailer.

> If the plaintiff sues the dealer alone, the dealer in his own interest should implead the manufacturer and thus avoid circuity of action.
>
> [*Id.* at 600–01.]

*See also Van Horn v. William Blanchard Co.*, 88 *N.J.* 91, 108 (1981) (Handler, J., dissenting) (in the context of tort action involving comparative negligence, single controversy doctrine "extends not only to joining all related causes but all parties in a single action."); *Thornton v. Potamkin Chevrolet*, 94 *N.J.* 1, 8 (1983) ("the doctrine expresses a judicial policy that when a matter is presented to a judicial forum, the litigants should not fractionalize their claims to the detriment of the system."); *In re Uniform Admin. Procedure Rules*, 90 *N.J.* 85, 102 n. 6 (1982) (single controversy doctrine may include parties as well as claims). Consequently, it is significant but not surprising that in *Crispin v. Volkswagenwerk, A.G., supra*, 96 *N.J.* 343, the Court expressly "reconsider[ed] the application of the entire controversy doctrine to parties as well as claims," and concluded that in expounding the party-joinder rule "the principles that underlay the entire controversy doctine should come into play."

### III.

It is contended by plaintiff that in *Crispin*, the extension of the entire controversy doctrine to include parties was limited. *Id.* at 343. We nevertheless there observed that "the complex web of causation that arises in cases of this nature suggests that joinder of known responsible parties in a single action be the norm." *Ibid.* Hence, if this appeal presents a case of "this nature," we must consider whether the "norm" for the "joinder of known responsible parties in a single action" applies. We are firmly of the belief that it does.

We can chart the application of the mandatory joinder of parties against the goals of the entire controversy doctrine. The comprehensive and conclusive determination of a legal controversy is an important objective of the entire controversy

doctrine. While not always isolated or identified as a discrete goal of the doctrine, the values inherent in that objective have been consistently endorsed. A disposition that reflects only a partial glimpse of the merits, or that results from the participation of some but not all of the major or important parties to the legal contest, or that resolves only a segment of the controversy does not fully effectuate the judicial ideal of complete, not piecemeal, adjudications. *See, e.g., Newmark v. Gimbel's, Inc., supra,* 54 *N.J.* 585; *Vacca v. Stika, supra,* 21 *N.J.* at 476.

In addition, party fairness is critical in the application of the entire controversy doctrine. In this modern era of litigation, particularly in the tort field with the advent of comparative negligence, it is highly desirable that all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy, should participate in its litigation. *See Van Horn v. William Blanchard Co., supra,* 88 *N.J.* at 108 (Handler, J., dissenting) ("the fairness of the resolution of tort claims follows a trial where all allegedly negligent parties are represented in a single action," (citing Prosser, "Comparative Negligence," 51 *Mich.L.Rev.* 465, 503–04 (1953)).

Judicial economy and efficiency—the avoidance of waste and delay—remain constants in the application of the entire controversy doctrine. Fragmented and multiple litigation takes its toll on not only the parties but the judicial institution and the public. This, if anything, is a more pressing concern today than it was in the past. The litigation explosion stretches judicial capabilities enormously and places extraordinary demands on the courts.[7] These concerns have impelled the Court to pursue novel and creative measures to cope with the increase in case-

---

[7]Statistical studies confirm the strain. *See, e.g., New Jersey Judiciary Annual Report 1987; New Jersey Judiciary 8 Year Superior Court Caseload Reference Guide 1979–1986.*

loads.[8]  We are importuned to conserve judicial resources; judicial energy is not inexhaustible or endlessly renewable. Thus, a rule that can control litigational extravagance and reduce piecemeal litigation is a necessity.

Courts have not only the responsibility but authority commensurate to deal with such compelling policy concerns.  This has been recognized from the early origins of the party-joinder rule.  *See, e.g., Broad St. National Bank v. Holden, supra,* 109 *N.J.Eq.* at 256; *McLaughlin v. Van Keuren and Schultz,* 21 *N.J.Eq.* 379, 381 (E. & A.1869).  Thus, a court could "correct the deficiency on its own motion by ordering process served upon the omitted necessary party whose presence or addition would give larger scope or effect to an adjudication of that claim as to the defendants already joined."  Schnitzer and Wildstein, *N.J. Rules Service, supra* at A IV–980.  In a given case a court can exercise broad judicial authority over joinder; it could raise the defense of failure to join an indispensable party on its own motion at any stage of the proceedings.  *Id.* at A IV–974.  It could also impose a "duty and obligation" on a plaintiff "to bring [an] action to resolve all the matters in one suit" and on defendants to include additional issues and parties to assure that end.  *Id.* at AIV–940 (citing *Vacca v. Stika, supra,* 21 *N.J.* at 476).

The Court's joinder authority exemplifies the judicial rule-making power that is derived from the Constitution, *N.J. Const.* of 1947, art. VI, § 2, ¶ 3, and is exclusive and plenary with

---

[8]For example, Chief Justice Wilentz established the Supreme Court Committee on Civil Case Management and Procedure in 1983 to fashion procedures to ensure that civil litigation is fairer, faster, and more economical.  See Supreme Court Committee on Civil Case Management and Procedures, *Toward a Theory of Civil Case Management and Improved Civil Procedures* at 78 (March 1985).  The Court also initiated procedural changes in litigation for the mandatory arbitration of automobile-injury lawsuits.  *N.J.S.A.* 39:6A–24 to 39:6A–35.  Another measure to reduce litigational excess was the Court's Complementary Dispute Resolution Programs.  1988 Judicial Conference Task Force on Dispute Resolution, Discussion Paper, Volume I, page 4.

respect to practice and procedure in the courts. *George Siegler Co. v. Norton*, 8 *N.J.* 374, 381 (1952); *Winberry v. Salisbury*, 5 *N.J.* 240 (1950). This authority is to be exercised to achieve efficient use of judicial resources, *Winberry v. Salisbury*, *supra*, 5 *N.J.* at 255, to expedite the business of the courts, to make practice just and simple, and to prevent unreasonable delay and expense, *Milk Drivers & Dairy Employees Local 680 v. Shore Dairies, Inc.*, 8 *N.J.* 32, 38 (1951). It should be "devised and promulgated for the purpose of promoting reasonable uniformity in the expeditious and even administration of justice." *Handelman v. Handelman*, 17 *N.J.* 1, 10 (1954). "The Rules of Practice are not an end unto themselves, but a means of serving the ends of justice." *Viviano v. CBS, Inc.*, 101 *N.J.* 538, 550–51 (1986).

All of the concerns that have energized our joinder rules under the entire controversy doctrine coalesce in the circumstances of this case. Thus, there can be little doubt that the participation of all potentially responsible persons as parties in the original action would have resulted in a fuller and fairer presentation of the relevant evidence and would have enabled the jury to make a more informed and complete determination of liability. It would have assured an ultimate determination that would be comprehensive, just and conclusive as to all persons implicated in the controversy.

Further, party fairness would have been served by joinder. The failure to have joined these defendants in the earlier action seems prejudicial and unfair. These defendants may well have concluded by the termination of the prior action that they were no longer targets. In addition, while technically their interests were not determined in the earlier action, they do not now have the same opportunity to persuade a jury that will be determining their liability that the former defendants are to be blamed. Moreover, such joinder would not be unfair to plaintiff. The plaintiff had sufficient information to have included these defendants in the earlier lawsuit. Plaintiff was aware that Dr. Brown believed that the hospital and its staff may have been

responsible for the delay; the second pediatrician also commented on the delay and certainly did not ascribe the delay to Dr. Brown or exonerate the current defendants. Dr. Greenwald, as an expert, based on his review of available information—hospital records and pretrial discovery—concluded that these defendants were responsible for the delay. Indeed, when Dr. Jones testified at trial that these defendants were responsible for the delay, it was not a total surprise to plaintiff; his testimony was elicited on cross-examination in response to plaintiff's own leading questions that suggested an awareness that the delay was attributable to persons other than Dr. Brown.

In addition, the court is now confronted with a duplication of lawsuits, multiple actions each involving the identical controversy and the same witnesses. The second lawsuit, though technically separate and independent, is in truth not much more than a re-run of the earlier lawsuit. The waste and inefficiency are obvious.

In sum, the failure to have joined these defendants in the earlier lawsuit is more than an unfortunate inconvenience. It is inconsistent with all of the policies that surround the entire controversy doctrine.

We thus conclude that the entire controversy doctrine appropriately encompasses the mandatory joinder of parties. Accordingly, we now hold that to the extent possible courts must determine an entire controversy in a single judicial proceeding and that such a determination necessarily embraces not only joinder of related claims between the parties but also joinder of all persons who have a material interest in the controversy.

Therefore, the current Rule on party-joinder must be amended to require mandatory joinder of parties consistent with our explication of the entire controversy doctrine. In reaching this conclusion we are satisfied that it comports completely with the reasoning expressed in our opinions in *Crispin*. *See Parks v.*

*Colonial Penn Ins. Co.*, 98 *N.J.* 42, 50 (1984) (*dictum* ); *Burke v. Deiner*, 97 *N.J.* 465, 482 (1984) (*dictum* ); *B.P. v. G.P.*, 222 *N.J.Super.* 101, 106–07 (App.Div.1987); *Chiacchio v. Chiacchio*, 198 *N.J.Super.* 1, 7–8 (App.Div.1984). To the extent decisions have eschewed application of a mandatory party-joinder rule with the understanding that the entire controversy doctrine does not encompass the joinder of parties, we disapprove their reasoning, without implying that in these cases good cause did not otherwise justify the non-joinder of parties in the particular circumstances. *See, e.g., Sentry Ins. Co. v. Cropski*, 218 *N.J.Super.* 196 (App.Div.1987); *Tall Timbers Property Owners Ass'n v. Tall Timbers, Inc.*, 217 *N.J.Super.* 119 (App.Div.1987).

We recognized in *Crispin* that our decision to extend the doctrine in certain circumstances might pose problems, observing that the Court would "proceed on a step-by-step basis recognizing that the doctrine is one of judicial fairness and will be invoked in that spirit." 96 *N.J.* at 343. Justice O'Hern acknowledged that there are "many difficult problems that extension of the doctrine may pose," noting that the New Jersey Civil Practice Committee had recommended in 1982 that the entire controversy doctrine not be extended to parties because, in its view, the already time-consuming and expensive practice of modern litigation would be only further complicated. However, even the constitutional authors of the current entire controversy doctrine provision believed that a rule of mandatory joinder would not prevent courts from properly and effectively managing litigation. 2 State of New Jersey Constitutional Convention of 1947, *supra* at 1192. The mandatory joinder rule that we adopt is not unbounded. Its limits are reached when the joinder would result in significant unfairness or jeopardy to a clear presentation of the issues and just result. Implicit in the development of the entire controversy doctrine is the recognition that economies and the efficient administration of justice should not be achieved at the expense of these paramount concerns. The entire controversy doctrine does not demand monolithic adjudications. Any possible unfairness to litigants, confusion in the presentation of issues, administrative unmanageability, or distortion in the

truth-determining process that may result from compulsory joinder of parties—or claims—can be eliminated or at least minimized by a trial court possessed of the discretion to excuse joinder or to order severance. [*Crispin, supra,* 96 *N.J.* at 354-55 (Handler, J., concurring).]

We add that the contours of this rule are not fixed precisely by this decision. Its contents and bounds can evolve with experience in the course of the exercise of this Court's regulatory authority over practice and procedure, either through formal rulemaking or case-by-case adjudications. *See, e.g., State v. Pillot,* 115 *N.J.* 558 (1989); *Crispin v. Volkswagenwerk, A.G., supra,* 96 *N.J.* 336; *State v. Gregory,* 66 *N.J.* 510 (1975).

## IV.

Although this Court is now establishing a mandatory party-joinder rule similar to the mandatory claim-joinder rule and consistent with the entire controversy doctrine, justice requires that it be applied only prospectively and to all cases not already on appeal. Understandably, plaintiff could have interpreted *Crispin* to have preserved the option of joining these defendants in the previous lawsuit or suing them in a separate action, an option that was not foreclosed by the specific or literal terms of the existing rules of practice. *See R.* 4:28-1(a); *R.* 4:5-1. Because our decision invokes our rulemaking, as well as our adjudicatory authority, fairness to plaintiff and others similarly situated impels us to follow the rule of prospectivity normally applied to legislative pronouncements.

Accordingly, the judgment below is affirmed.

CLIFFORD, J., dissenting in part.

I join in all but section IV of the Court's comprehensive opinion. Section IV applies the mandatory party-joinder rule prospectively only. I see nothing in the circumstances of the case or in considerations of fairness to justify depriving these defendants of the benefit of a rule that they advocated and have succeeded in establishing, one that we all agree advances

the goals of judicial economy and efficiency, *ante* at 23–24. The Court points out that "[a]ll of the concerns that have energized our joinder rules under the entire controversy doctrine coalesce in the circumstances of this case," *ante* at 25. It observes that "the participation of all potentially responsible persons as parties in the original action would have resulted in a fuller and fairer presentation of the relevant evidence and would have enabled the jury to make a more informed and complete determination of liability," and that joinder would have assured a "comprehensive, just and conclusive" determination. *Ante* at 25.

There is more. The Court acknowledges that "party fairness would have been served by joinder," *ante* at 25; that "[t]he failure to have joined these defendants in the earlier action seems prejudicial and unfair," *ante* at 25; and that "joinder would not be unfair to plaintiff." *Ante* at 25. And then the wind-up: "In sum, the failure to have joined these defendants in the earlier lawsuit is more than an unfortunate inconvenience. It is inconsistent with all of the policies that surround the entire controversy doctrine." *Ante* at 26.

How then can it be that the interests of "fairness to plaintiff and others similarly situated," *ante* at 28, require prospective application? Surely no one could have been misled by *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336 (1984) (decided before the complaint was filed in the first case), for as the Court points out, *ante* at 22, we there observed that joinder of known responsible parties should be the norm. *Id.* at 343.

Up until the final two paragraphs of the Court's opinion the plaintiffs lose and defendants win. Imagine the jolt the parties must have experienced when they got to the end!

I would apply today's ruling to the parties in this case.

Justice GARIBALDI joins in this partial dissent.

*For affirmance*—Justices POLLOCK, O'HERN, HANDLER and STEIN—4.

*Dissenting*—Justices CLIFFORD and GARIBALDI—2.