290 N.J. Super. 162 (1996)
675 A.2d 254
JOSEPH FISCHER, PLAINTIFF,
v.
GRACE AND HOWARD HECK, DEFENDANTS.
Superior Court of New Jersey, Law Division Special Civil Part Monmouth County.
January 17, 1996.
*165 Joseph Fischer, pro se.
*166 Peter Bass, for defendants.
D'AMICO, J.S.C.
On October 1, 1991, plaintiff Joseph Fischer (tenant) rented a house located at 13 Beverly Court, Tinton Falls, N.J., from defendants Grace and Howard Heck (landlords). The term of the lease was twelve months, and rent was payable at the rate of $1,050 per month. The tenant paid an initial security deposit of $1,575 which, according to the lease, was deposited by the landlords in an account at Shrewsbury State Bank (Bank).
On or about April 10, 1992, the Bank acquired 13 Beverly Court, Tinton Falls, N.J., from the landlords by way of foreclosure proceedings. The tenant remained in the house on a month-to-month basis.
In 1993, the tenant fell behind in his rent obligations. The Bank filed an action for possession. The tenant vacated the house in January 1994. The Bank also filed a complaint in the Special Civil Part, Law Division, claiming that the tenant had failed to make rent payments totalling $5,500. The Bank also claimed $1,525 incurred to repair damage allegedly done by the tenant to the fixtures on the premises. The tenant answered the complaint, alleging that no oral agreement was entered into with the Bank, that no damage was done to the premises, and that the initial security deposit was never refunded. A stipulation of settlement was executed by both parties on August 4, 1995, in which the Bank agreed to accept $1,500 from tenant in full settlement of its claims.
The tenant has instituted this suit in Special Civil Part against the original landlords, alleging that they never advised him of the foreclosure proceedings instituted by the Bank. The tenant further claims that the initial security deposit of $1,575 was never transferred to the Bank following the foreclosure proceedings. Moreover, the tenant alleges that the security deposit was never refunded and that no reason was ever given for failure to return it.
*167 The tenant contends that the issue of the security deposit was not factored into the August 4, 1995, stipulation of settlement with the Bank, because the tenant denied causing any damage to the house. The tenant testified at the trial of this case that he understood that the Bank simply wanted to recover money for unpaid rent. The tenant further contends that the security deposit was never transferred to the Bank in the first place. The tenant seeks recovery of double the amount of his security deposit, interest, and attorney's fees pursuant to N.J.S.A. 46:8-21.
The landlords maintain that the tenant's claim should have been raised in defense of the actions filed by the Bank; that the Bank stepped into the position of the landlords; and that they accepted responsibility for and obligations with regard to, the security deposit. The landlords also argue that the tenant was aware that the Bank owned the property and that there was a question as to the security. Counsel for the landlords argues that having settled the matter, the tenant is now estopped from suing the original landlords for the security deposit, his lawsuit against the landlords being barred by the entire controversy doctrine.
The question of the disposition of a security deposit upon a foreclosure of leased premises is governed by N.J.S.A. 46:8-20, which provides as follows:
Any person, whether the owner or lessee of the property leased, who or which has or hereafter shall have received from a tenant or licensee a sum of money as a deposit or advance of rental as security for the full performance by such tenant or licensee of the terms of his contract, lease or license agreement, or who or which has or shall have received the same from a former owner or lessee, shall, upon conveying such property or assigning his or its lease to another, or upon the conveyance of such property to another person by a court in an action to foreclose a mortgage thereon, at the time of the delivery of the deed or instrument of assignment, or within five days thereafter, or in the event of the insolvency or bankruptcy of the person receiving said deposit, within five days after the making and entry of an order of the court discharging the receiver or trustee, deal with the security deposit by turning over to his or its grantee or assignee, or to the purchaser at the foreclosure sale the sum so deposited, plus the tenant's portion of the interest or earnings accumulated thereon, and notify the tenant or licensee by registered or certified mail of such turning over and the name and address of such grantee, assignee or purchaser.
*168 It is undisputed that the landlords failed to comply with the requirements of this statute. The issue, which has not before been decided in a published opinion, is what the consequences of noncompliance with the statute should be.
Had the landlords turned over to the Bank the amount of the security deposit plus interest, they would have been relieved from liability to the tenant for the repayment thereof pursuant to N.J.S.A. 46:8-21, which provides:
Any owner or lessee turning over his or its grantee, assignee, or to a purchaser of the leased premises at a foreclosure sale the amount of such security deposit, plus the tenant's portion of the interest or earnings accumulated thereon, is hereby relieved of and from liability to the tenant or licensee for the repayment thereof; and the transferee of such security deposit, plus the tenant's portion of the interest or earnings accumulated thereon, is hereby made responsible for the return thereof to the tenant or licensee, in accordance with the terms of the contract, lease, or agreement unless he or it shall thereafter and before the expiration of the term of the tenant's lease or licensee's agreement, transfer such security deposit to another, pursuant to section 2 hereof[1] and give the requisite notice in connection therewith as provided thereby.
It is also clear, pursuant to this statute, that had the Bank received the security deposit from the landlords, it would have become responsible for disposition of the deposit upon the tenant's completion of the lease. Furthermore, it has been held that a successor landlord is liable for return of the security deposit which had been paid to the prior foreclosed-upon landlord but which had not been turned over to the successor landlord. Hunter v. J. and H. Weissberger, 212 N.J. Super. 262, 514 A.2d 871 (Law Div. 1986).
The court in Hunter noted that the statutes are silent when dealing with a situation where, as in the present case, the original landlord fails to turn over the security deposit to the successor landlord. Reviewing the legislative history, the court found that the following legislative statement followed the text of what is now known as N.J.S.A. 46:8-20:
This legislation improves the working of the tenant security deposit law following the sale of a building. Previously tenants had difficulty in learning what happened *169 to their security deposit and in having it continue in force. This bill makes its continuation in force with the new owner automatic.... (quoting Statement following text of Assembly Bill 1126, L. 1979, c. 28, N.J.S.A. 46:8-19, -20 (emphasis supplied)
[Id. at 265, 514 A.2d 871].
The court found that N.J.S.A. 46:8-20, places the burden of security deposits on the landlord who accepts the security and also upon the landlord who subsequently purchases rental property. As the court stated:
This statute forewarns successor landlords that if they do not receive security deposits from the prior landlord, then they will be liable for returning the security to the tenant. There is clear legislative authority to this effect and this court is persuaded by the statute and accompanying legislative history to so rule.
[Id. at 266, 514 A.2d 871.]
The issue in this case, however, is whether the original landlord remains liable to a tenant for repayment of a security deposit plus interest, if the security deposit has not been turned over to the grantee or purchaser at a foreclosure sale or upon transfer of title.
Under New Jersey's Security Deposit Act, N.J.S.A. 46:8-19 to -26, a security deposit is money that still belongs to the tenant, but is held by the landlord in trust to protect the landlord against the tenant's failure to perform under the lease. The Security Deposit Act requires the landlord to put the tenant's security deposit in a separate bank account that pays interest on the deposit. The landlord must tell the tenant in writing the name and address of the bank where the deposit is being kept, and the amount of the deposit. The Act states clearly that if the landlord does not give the tenant this written notice within thirty days after payment of the security deposit, the landlord loses the right to hold the security deposit. Delmat Corp. v. Kahn, 147 N.J. Super. 293, 371 A.2d 296 (App.Div. 1977).
The Security Deposit Act requires that within thirty days after the tenant moves out, the landlord either must return the security deposit with interest or give the tenant a complete list of damages the landlord claims the tenant did to the property. The landlord *170 must also tell the tenant at that time how much it will cost to fix the damage the landlord claims the tenant caused.
N.J.S.A. 46:8-21.1 provides in part:
Within 30 days after the termination of the tenant's lease or licensee's agreement, the owner or lessee shall return by personal delivery, registered or certified mail the sum so deposited plus the tenant's portion of the interest or earnings accumulated thereon, less any charges expended in accordance with the terms of a contract, lease, or agreement, to the tenant or licensee, or, in the case of a lease terminated pursuant to P.L. 1971, c. 318 (C. 46:8-9.1), the executor or administrator of the estate of the tenant or licensee or the surviving spouse of the tenant or licensee so terminating the lease. The interest or earnings and any such deductions shall be itemized and the tenant, licensee, executor, administrator or surviving spouse notified thereof by personal delivery, registered or certified mail.... .
In any action by a tenant, licensee, executor, administrator or surviving spouse for the return of moneys due under this section, the court upon finding for the tenant, licensee, executor, administrator or surviving spouse shall award recovery of double the amount of said moneys, together with full costs of any action and, in the court's discretion, reasonable attorney's fees.
In order to prove a cause of action for a return of a security deposit, a former tenant must show the existence and subsequent termination of a landlord-tenant relationship, the receipt of a security deposit by the landlord, and the failure of the landlord to return the deposit monies. Veliz v. Meehan, 258 N.J. Super. 1, 4, 609 A.2d 45 (App.Div. 1992). The tenant in this case has met his burden of proof. Furthermore, the tenant is not deprived of the benefits of the Security Deposit Act merely because it defaulted on the lease. Even in a default situation, upon termination of a lease, a landlord is obligated by statute to return the security deposit or notify the tenant in writing, by registered or certified mail, as to the reason for retaining it; and breach of that duty will warrant imposition of double damages. Ibid.
In Veliz, the Appellate Division concluded with the following strong statement:
In sum, we hold that the Security Deposit Act applies facially to the termination of all leases, other than those specifically excluded by statute from the scope of its jurisdiction, whether by expiration of the contract period or by unilateral action by the tenant. In every case, the landlord is obliged to return the security deposit *171 within 30 days or explain in writing why he or she is not doing so. Failing such action, the tenant is entitled to recover twice the deposit under the statute.
[Id., at 5, 609 A.2d 45.]
I conclude that the original landlords in this action have not been relieved of their obligation to return to the tenant his security deposit because they have not complied with N.J.S.A. 46:8-21. Although the Bank might also be liable for return of the security deposit, the Bank does not stand in the shoes of the original landlords in this suit, since it is the latter's non-compliance with the requirements of N.J.S.A. 46:8-20, that is in question.
The next issue to be determined  also one of first impression  is whether the tenant's claim is barred by the entire controversy doctrine. R. 4:30A, which codifies the doctrine, provides that:
Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:65-5 (foreclosure actions) and R. 4:67-4(a) (leave required for counterclaims or cross-claims, in summary actions).
Originally, the entire controversy doctrine mandated joinder of only those claims arising from "the same overall transaction" involving the parties already named in the law suit. Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343-44, 476 A.2d 250 (1984); Tall Timbers Property Owners Ass'n. v. Tall Timbers, Inc., 217 N.J. Super. 119, 123, 524 A.2d 1315 (App.Div. 1987). In 1989, however, the Supreme Court extended the entire controversy doctrine to mandate joinder of all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy. Cogdell v. Hospital Center, 116 N.J. 7, 23, 560 A.2d 1169 (1989). In expanding the doctrine, the Supreme Court reasoned that the party-joinder rule, R. 4:28-1, and the claims-joinder rule, R. 4:27-1, both reflect a common policy and, "are not only conceptually similar but are procedural twins." Id. at 17, 560 A.2d 1169.
The fundamental principle behind the inclusion policy of the entire controversy doctrine is that:

*172 [T]he adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.
[Id. at 15, 560 A.2d 1169.]
The doctrine is a reflection of the constitutional unification of the state courts and the comprehensive jurisdiction vested in the Superior Court established under the New Jersey Constitution which recognized the value of resolving related claims in one adjudication so that "all matters in controversy between the parties may be completely determined." N.J. Const., art. VI, § 3, ¶ 4.
Note, however, that both this action and the prior action brought by the Bank against the tenant were filed in the Special Civil Part of the Law Division. As indicated in the comment to Rule 6:1-3, the concept of a Special Court of Limited Jurisdiction, functioning in an expedited manner, was too useful not to survive the demise of the county district courts. Therefore, those courts continued virtually intact as the Special Civil Part, a Superior Court division of limited jurisdiction governed by Part VI rules and to which the developed body of district court case law continues largely applicable. Pressler, Current N.J. Court Rules, comment on R. 6:1-3 (1995).
The objectives behind the entire controversy doctrine are threefold: (1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, to both the parties before the court as well as to prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented multiple and duplicative litigation. DiTrolio v. Antiles, 142 N.J. 253, 267, 662 A.2d 494 (1995); Cogdell, supra, 116 N.J. at 22-24, 560 A.2d 1169. While these objectives should be pursued in all courts, the consequences of their nonattainment are likely to be less dire in the Special Civil Part, a court of limited jurisdiction which functions in an expedited manner.
*173 Furthermore, the boundaries of the entire controversy doctrine are not limitless. The doctrine does not apply to bar component complaints that are unknown, unarisen or unaccrued at the time of the original action. Mystic Isle Development Corp. v. Perskie & Nehmad, 142 N.J. 310, 323, 662 A.2d 523 (1995). Application of the doctrine is discretionary and clarification of the limits of the doctrine has been left to case-by-case determination. The doctrine should not be applied where joinder would result in significant unfairness to the litigants or jeopardy to a clear presentation of the issues and a just result. Circle Chevrolet v. Giordano, Halleran and Ciesla, 142 N.J. 280, 290, 662 A.2d 509 (1995). Furthermore, application of the doctrine is limited in that, "[T]he party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have fully litigated that claim in the original action." Cafferata v. Peyser, 251 N.J. Super. 256, 261, 597 A.2d 1101 (App.Div. 1991). (Entire controversy doctrine did not bar medical malpractice action by reason of a patient's pro se settlement of a prior special civil part action brought against him by defendant physicians' professional association to recover a bill for services for the same medical procedure of which the medical malpractice suit complained).
In this case, the tenant, appeared pro se, filed an answer to the Bank's complaint in which he alleged that his security deposit of $1,525 plus interest from October 1, 1991, was not returned. The tenant testified that it was not until the Bank's action was filed that he learned that the Bank did not have the security deposit. The tenant then settled with the Bank for $1,500 toward past due rent. He testified, however, that he and the Bank made no agreement with respect to damages, as there were none. The stipulation of settlement between the Bank and the tenant dated August 4, 1995, makes no reference to the security deposit. The tenant filed this action against the landlord for the return of the security deposit together with interest, statutory penalties and attorney's fees, on March 31, 1995, at or about the time that he learned that the Bank did not have the security deposit.
*174 This court concludes that it would be fundamentally unfair to bar the tenant's complaint against the landlord for the security deposit. The tenant did not receive, at the time of transfer of title of the property to the Bank, notice as to the disposition of the security deposit, as required by the lease and the statute. Consequently, the tenant did not have a fair and reasonable opportunity to litigate fully his claim for return of the security deposit in the original action filed by the Bank. His principal concern at the time of the prior proceeding was the settlement of a case in which the Bank was demanding judgment against him for the sum of $7,025, of which $5,500 represented unpaid rent and $1,525 represented alleged damages to the premises.
The premise of the Security Deposit Act is that a security deposit is held by a landlord in trust. A landlord remains liable for return of the security deposit unless it complies with N.J.S.A. 46:8-20, at the time of a foreclosure by transferring the security deposit to the Bank. If, as in this case, the security deposit is not transferred upon foreclosure, then the landlord is not relieved of liability to the tenant for repayment of the security deposit. N.J.S.A. 46:8-21.
It would be fundamentally unfair to preclude a tenant from pursuing in the Special Civil Part his remedy against the original landlord by interposing the entire controversy doctrine as a bar. Such an application of the doctrine would result in the unjust enrichment of the original landlords. It would also subvert the public policy which carefully guards a tenant's rights to the return of its security deposit by providing for recovery of double the amount of the deposit if the landlord has not complied with the Security Deposit Act. These disadvantages far outweigh any advantage in terms of judicial economy and efficiency which could be derived from the application of the entire controversy doctrine. As Judge Pressler stated in Cafferata v. Peyser, supra at 251 N.J. Super. 262-3, 597 A.2d 1101:
The ability of the judicial system to cope effectively with the volume of minor commercial litigation with which it must deal is advanced by the informality of *175 mediation-type proceedings in which pro se litigants are able quickly, inexpensively, expeditiously, and with minimum resort to legal counsel and judicial intervention, to resolve specifically stated and narrowly defined small claims, whether or not instituted in the small claims division. These proceedings were never intended to have preclusionary consequences beyond their own scope. It is not only unfair that they should do so, but if they do, the legitimacy of small claims processing will be seriously undermined. It would obviously be counterproductive in the extreme were a preclusionary rule enforced in such a way as to penalize, without any concomitant benefit to the parties or to the system, a pro se litigant's participation in the small claims mediation process or other expedited processing mechanism. Such enforcement would convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting. That is not its function. (emphasis added).
Judgment will therefore be entered in favor of plaintiff in the amount of $3,050, representing double the amount of the security deposit, plus costs. Plaintiff's claim for attorney's fees will be denied, as plaintiff is not an attorney and has appeared pro se.
NOTES
[1] Section 46:8-20.