286 N.J. Super. 164 (1995)
668 A.2d 465
INTERCHANGE STATE BANK, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
GERALD VEGLIA, WILLIAM BRAVAKIS, ESTATE OF ROBERT UTTER, DEFENDANTS, AND TRICO MORTGAGE COMPANY, INC. AND UNITED JERSEY FINANCIAL CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division..
Argued October 17, 1995.
Decided December 26, 1995.
*167 Before Judges KEEFE, WEFING and A.A. RODRIGUEZ.
Patrick J. Spina argued the cause for appellant (Andora, Palmisano & Geaney, attorneys; John P. Palmisano, of counsel; Mr. Spina and Joseph A. Venti, on the brief).
Kathleen McLeod Caminiti argued the cause for respondents (Collier, Jacob & Mills, attorneys; Cynthia M. Jacob, of counsel).
The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff Interchange State Bank ("Interchange") appeals from the entry of summary judgment in favor of defendants Trico Mortgage Company Inc., United Jersey Financial Corporation, Gerald Veglia and William Bravakis (referred to herein collectively as "Trico"), on Interchange's claim under the New Jersey Racketeering statute, N.J.S.A. 2C:41-1 to -6.2 ("RICO"). Interchange also appeals the entry of summary judgment in favor of Trico on Trico's counterclaim whereby Interchange was found liable to Trico, pursuant to N.J.S.A. 12A:3-419, because it paid on a check made to the order of Trico over a fraudulent endorsement.
This case and related litigation stems from the fraudulent actions of Robert Utter ("Utter"). In or around December 1987, Utter and his wife Gail, (hereinafter occasionally referred to as the "Utters") and Equishare Inc. ("Equishare"), a corporation wholly owned by the Utters, entered into a joint venture with First Central Mortgage Services Inc. ("First Central"), a licensed mortgage company engaged in the origination of first and secondary mortgage loans. Through the joint venture, the Utters and Equishare took over a branch office of First Central in Rochelle Park, New Jersey, and operated it as an independent entity outside of First Central's direct supervision. Utter was given the title of assistant vice-president. By corporate resolution, First Central opened a checking account at Interchange, and the Utters were given exclusive check signing and depository authority.
*168 From December 1987 through January 1989, Utter and Equishare closed on a variety of first and secondary loans in which First Central was named mortgagee or lender of record. During this period the Utters and Equishare generated in excess of $16 million in mortgage loans for First Central.
In the summer of 1988, Trico Mortgage Company contacted John Taylor, the president of First Central, and notified him that it was having problems with a few of the appraisals on loans that it had purchased from First Central. The appraisals in question had been altered to reflect higher values than had been originally reported in order to obtain the loans. The altered appraisal reports had been generated by Utter and Equishare at the Rochelle Park branch of First Central. Trico determined that approximately twenty appraisals had been altered. After new appraisals were completed and a determination made as to whether Trico would suffer financially because of the altered appraisals, Trico agreed to hold the loans as long as it did not have collection problems. There was no official notice given to the mortgagors or to the Banking Commission.
Both Frank Tricarico, the president of Trico, and Taylor believed that Utter was responsible for the altered appraisals because he was the only person at the First Central branch who stood to gain from an increase in the number of loans obtained. Utter was confronted and, in response, sent an indemnification letter dated August 3, 1988 to Trico, the text of which read:
Dear Frank:
Please allow this letter to serve as both a corporate and a personal guarantee from Equishare Inc., its fully owned subsidiaries and Robert and Gail Utter, to Trico Mortgage Company, Inc. in order to indemnify the same from any losses arising from falsification or alteration of any appraisals originating from the office of First Central Mortgage Services, Inc., in Rochelle Park, New Jersey.
This guarantee not only includes any problems of this nature which have already surfaced, but extends to all problems of this type, surfaced or not.
A note on the mortgage on 72 Ahnert Road, North Haledon, New Jersey shall also be executed as additional collateral for this guarantee.
Additionally, in July 1988 it came to light that liens on a First Central mortgagor's property remained unpaid following a mortgage *169 refinancing arranged by Utter. The First Central mortgage had been assigned to Trico. Utter however, failed to pay off the prior mortgage held by Commonwealth Mortgage Co. ("Commonwealth"). Subsequently, Commonwealth went forward with foreclosure proceedings against the mortgagor. In August 1988, Trico also began foreclosure proceedings against the mortgagor, alleging that he had defaulted in payment. The mortgagor answered the Trico complaint and crossclaimed, alleging that Trico had failed to pay off the debt owed to Commonwealth; a condition of the refinancing of the mortgage.
As a result of these events, First Central intensified its supervision over Utter and Equishare. From July 1988 to January 1989, principals from First Central visited the Rochelle Park office several times a week and double checked the closings before bringing the loans to Trico. First Central and Trico also established a system whereby when Utter brought a loan to Trico, Trico would call persons named on the disclosure statement to find out if the check was received.
By January 31, 1989, the Utters and Equishare became disassociated from First Central and entered into a joint venture with Great American Mortgage Corp. ("Great American") to manage a branch office located at the same site in Rochelle Park. Although Tricarico denied it, Edward Roncoroni, a principal of Great American, testified that he discussed Utter's move to Great American with Tricarico on several occasions in late 1988, and January 1989. Tricarico told Roncoroni that Utter did a fine job packaging loans. Again, like the arrangement with First Central, Utter operated the office as an independent entity outside of Great American's direct supervision. Great American opened a checking account at Interchange, with exclusive signatory authority residing in the Utters and their agents. Trico continued to hold the majority of mortgages processed through Great American.
In April 1989, Trico insisted that Utter execute an indemnity/guarantee agreement in which Utter pledged to make good on any losses sustained by Trico because of the alteration of appraisals *170 or "any problems of this nature which have already surfaced but extends to all problems of this type surfaced or not." Trico was identified as the "Lender", and Utter was the "Guarantor". In part the agreement provided:
WHEREAS, Lender has been engaged in a business relationship with Guarantor and First Central Mortgage Services, Inc. and Great American Mortgage Co., whereby they have been purchasing and servicing mortgages issued by Guarantor/and Great American Mortgage Co., and First Central Mortgage Services, Inc. and expects to continue and purchase said mortgages, and
WHEREAS, Guarantor has agreed to protect Lender from any potential foreclosure deficiency or other loss that may result from any mortgages purchased or to be purchased in the future, under certain specific circumstances, set forth below, and
WHEREAS, Rochelle Title Agency, Inc., Equishare Inc., its principals, Robert and Gail Utter, have agreed to guarantee payment to Lender in the event of any such foreclosure deficiencies or other loss.
The agreement was prepared by James Greenberg, an attorney for Trico at the instruction of Tricarico. In the agreement, Utter evidenced the transfer of title to his North Haledon property to Trico as collateral for the various guarantee agreements provided by Utter. The agreement was signed by the Utters and Tricarico on April 18, 1989.
Three days later, on April 21, 1989, suit was filed by Great American and First Central (the Great American suit). Great American and First Central named fifteen parties, including the Utters and Interchange. Trico was not named as a defendant. In the first and second counts of the complaint, Great American and First Central, alleged theft and fraudulent activities on the part of their corporate officer and office manager, Robert Utter. In the sixth count, Great American and First Central alleged that Interchange wrongfully and unlawfully accepted checks, which Utter defalcated, for deposit into checking accounts of Utter companies, namely Equishare and Rochelle Title Agency Inc., in violation of N.J.S.A. 12A:3-419.
Apparently, Utter had devised a scheme whereby he would transfer monies out of the First Central and Great American accounts at Interchange into various Utter-owned corporate accounts, *171 also at Interchange, under the guise of "escrow" or "deferred maintenance." The Utters also embezzled and converted to themselves and their controlled companies portions of certain loan and closing proceeds which were to have been remitted to third parties in accordance with the terms of the loans. In these instances, the Utters would deposit fraudulently endorsed checks into the checking accounts of the Utter controlled companies maintained at Interchange. Interchange accepted the deposits and credited Utters' accounts. Thereafter, Utter would have complete control of the funds. Interchange alleges that Utter was using some of this money to pay off the bad loans placed with Trico. Utter was also arrested on criminal charges stemming from these events in April, 1989.
Prior to committing suicide on August 8, 1989, Utter made a series of tape recordings from his death bed while ingesting vodka and sleeping pills. A portion of his statement follows:
On August 1st of 1988, ah, there was a dramatic turn in our business. The turn in our business was created because of the fact that we found out that I Robert, Utter, although I was not named and I tried to place the blame elsewhere, ah, was in fact, indeed, guilty of changing the values that were set on the appraisals in order to obtain loans and have them purchased....
What I was doing was taking the funds from Great American Mortgage Company's funding account, holding back as much as I could possibly hold back, always paying the actual loan, ah, recipient, ah, because of course, they were sitting there waiting for them and attempting to take and see if I could not possibly, ah, ah, elongate the use of the money in order to pay off the old First Central bills and at which time sometime early in April, Mr. Frank Tricarico became involved and knew what was going on because I had openly admitted to him. Ah, Mr. Tricarico in order to try to ah, protect himself had the house that I was living in sold to him. Now it was sold to him at a cost of $350,000 even though it was appraised at in excess of a half a million or at a half a million dollars....
The checks were deposited in Interchange State Bank even though they were drawn on or to other people, ah. Interchange through their own negligence accepted these deposits and credited the accounts, I, of course, had control of the funds and moved it in whatever manner I saw fit.
On June 12, 1992, more than three years after the Great American suit was instituted, Interchange petitioned the trial court for leave to bring a third party complaint against Trico; two of Trico's former employees, Gerald Veglia and William Bravakis; *172 and United Jersey Financial Corp. ("UJF"), a parent corporation of Trico, based on state RICO and indemnification and contribution theories. By order dated September 15, 1992 Judge James T. Murphy denied the motion, but ordered that the entire controversy doctrine would not bar such actions if timely filed.
Interchange then instituted two separate suits against the aforementioned parties. The first action, from which this appeal ensues, was filed on April 22, 1992 alleging state RICO violations, and is captioned Interchange State Bank v. Veglia, et al., Docket No. BER-L-4704-92. (Pa35).[1] Utter had dealings and relationships with several Trico employees, and the president of Trico, Tricarico. These dealings and the Utter death tapes formed the basis of Interchange's RICO conspiracy allegations. Interchange alleged that Trico, Frank Tricarico, Gerald Veglia and William Bravakis all engaged in a pattern of racketeering activity including theft by deception (N.J.S.A. 2C:20-4); falsifying or tampering with records (N.J.S.A. 2C:21-4); misconduct by corporate officials (N.J.S.A. 2C:21-9); commercial bribery (N.J.S.A. 2C:21-10); hindering apprehension or prosecution (N.J.S.A. 2C:29-3); as well as violations of state and federal banking laws including, N.J.S.A. 17:11B-14(e).
In June 1992, Trico filed a motion for dismissal of the complaint for failure to state a claim upon which relief can be granted R. 4:6-2. The motion was based upon the premise that no RICO action could lie against Trico as a matter of law under Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), because Trico's actions were not the proximate cause of any of the damages claimed by Interchange.
Thereafter, Interchange amended its original complaint to allege that it had been damaged by the entry of judgment against it in the Great American suit. In particular, by way of its RICO *173 claim, Interchange sought to recoup from Trico the losses it might sustain in connection with the Great American judgment entered against it under N.J.S.A. 12A:3-419 for improperly honoring checks that lacked endorsement by the named payee.[2] Interchange's amended complaint also asserted claims of negligent supervision against Trico and UJF. By order dated September 15, 1992, Judge Murphy dismissed the second count of the complaint which alleged negligent supervision of the activities of Trico's officers, employees, and agents.[3]
Trico then filed an answer to the amended complaint responding to the remaining RICO count. Trico also asserted a counterclaim against Interchange. In the fourth count of the counterclaim, Trico sought judgment against Interchange for having improperly honored a check in the amount of $119,820.58 made payable to Trico but deposited into one of Utter's accounts over a false endorsement in violation of N.J.S.A. 12A:3-419.
In November 1992, Trico filed a motion for partial summary judgment on the fourth count of its counterclaim. Judge Murphy granted Trico's motion on January 8, 1993, and entered partial summary judgment against Interchange in the amount of $119,820.58, plus prejudgment interest. The judge found that when the subject check was honored by Interchange, which was both the drawee and collecting depository bank without Trico's endorsement there was common law conversion of funds. Interchange's motion for leave to appeal was denied by this court on February 23, 1993.
*174 In the meantime, discovery continued and several depositions were taken of Interchange's officers and employees. The result of the discovery was a stipulation by Interchange that neither its officers nor its employees were influenced, let alone improperly influenced, by Trico to cash or accept for deposit checks defalcated by Utter. Specifically, Interchange stipulated as follows:
No Interchange officer or employee (present or former) was ever threatened, coerced, bribed, offered money, promised gifts or favors, or was otherwise improperly influenced in any way by Robert Utter, Gail Utter, Gerald Veglia, William Bravakis, Frank Tricarico, Trico (or any employee of Trico) or United Jersey (or any employee of United Jersey) to cash or accept for deposit checks presented by or on behalf of Robert Utter, Gail Utter or Robert Utter's Companies. As used herein, Robert Utter's Companies include Rochelle Title, Associated Investment, Equishare Inc., Equishare Financial Services, Embassy Financial, Express Title, Metro Express Title, First Central Mortgage Services and Great American Mortgage Company.
Thereafter, Trico moved for summary judgment as to the remaining count of the amended complaint, Interchange's RICO claim.[4] In support of its motion Trico relied upon the deposition testimony of some 20 officers and employees of Interchange and the above stipulation.
On July 23, 1993, Interchange moved to stay the summary judgment proceedings pending completion of discovery. Judge Murphy entered an order extending discovery and adjourning the return date on Trico's motion for summary judgment. The summary judgment motion was ultimately argued on October 22, 1993. On that date, the trial court entered an order granting summary judgment in favor of Trico on the remaining count of the amended complaint. In pertinent part Judge Murphy found that:
no genuine issue of material fact exists as to proximate cause [and] any conduct attributable to defendants Trico, UJFC, Veglia and Bravakis does not comply with the "proximate cause" standard as set forth in Holmes v. Securities Investors [Investors] Protection Corp., supra, for [Interchange] to maintain this civil RICO action against movants.
*175 This appeal ensued. Interchange alleges that Trico, Tricarico, Veglia and Bravakis, through a clear pattern of racketeering activities:
conspired to embezzle, convert and/or steal and did embezzle, convert and/or steal numerous second mortgage loan proceeds amounting to hundreds of thousands of dollars which were on deposit at Interchange. To conceal this "scheme," the Utters with the purposeful assistance of the aforementioned individuals and entities made payments on those loans in accordance with the terms of the promissory notes.
Veglia was the assistant vice president at Trico, in which capacity, as a loan officer, he had the authority to review and approve mortgage funding applications. In January 1988, Utter invited Veglia to invest in a "title company" owned by Utter, pursuant to which Veglia would receive a one percent interest for each $1,000 invested. Veglia accepted the opportunity and also invited another Trico officer, William Bravakis, to invest in the title company. Between January 1988 and January 1989, Veglia invested approximately $10,000 in the title company, Rochelle Title Agency. He did not receive any certificates of stock for that investment.
Veglia also sold his 1987 Camaro automobile to Utter for $5,000 in 1987, a price that Veglia deemed less than the car's market value. Utter then arranged a substitute car rental for him. After Veglia made his initial investments he became aware that Rochelle Title would be arranging title insurance for the loans originated by Utter.
Further, in February 1989, Utter loaned Veglia $35,000 with no evidence of that loan by way of promissory note and with no interest. There were no terms and/or conditions of repayment discussed, except that Veglia could, if he wished, repay Utter from the promised quarterly dividends from Rochelle Title. Also identified during Veglia's deposition were checks and wire transfers representing $18,531.20 of "dividends" paid to him, from which he paid $8,957 to other investors, netting $9,574.20 of "dividends" to himself. Veglia was fired by Trico in the spring of 1989 when *176 Tricarico discovered that Veglia had a hidden interest in the Utter companies.
It is through this relationship that Interchange maintains that Veglia was effectively bribed by Utter to continue to approve loans generated by him.
Bravakis was employed at Trico as an underwriter. At no time while he was employed by Trico did Bravakis have any lending authority. Bravakis also invested approximately $2,500 in Rochelle Title. He was aware that Rochelle Title arranged the title insurance for the loan packages that he reviewed for Trico. Bravakis received $1,750 of dividends from Rochelle Title from July to November, 1988 in the form of three checks.
As part of Interchange's conspiracy allegations, it maintains that Frank Tricarico was inexorably involved with Utter's scheme of defalcating funds through the Bank. Specifically, Interchange maintains that Tricarico discovered that Utter had falsified appraisals in July/August 1988, and ignored his fiduciary duty by not reporting Utter's illegal acts to the proper authorities at that time. Instead, he protected his own interests by securing the indemnity letter of August 3, 1988. Additionally, Interchange alleges that Tricarico was integral in setting up the connection between Utter and Great American once Utter's relationship with First Central had soured in the fall of 1988. While Trico, Tricarico, Veglia and Bravakis denied knowledge of Utter's scheme and actual method of defalcations and further deny complicity with Utter in that regard, these fact issues need not be decided in order to resolve the issues that result in this appeal.

I
Interchange alleges that the trial court should not have granted summary judgment and dismissed its RICO action because there exists a genuine issue of material fact as to whether Interchange *177 suffered damages that were proximately caused by Trico.[5] Interchange argues that defendants Utter, Veglia, Bravakis, Trico and UJF were conspirators and together constituted a RICO "enterprise", and that said enterprise engaged in a pattern of racketeering activity cognizable under New Jersey's RICO statute during the period 1988 through April 1989. N.J.S.A. 2C:41-1 to -6.2. Consequently, Interchange maintains that the liability of Trico must be addressed in light of the predicate actions of their coconspirator, Robert Utter.
Interchange contends that as a direct and proximate result of Utter's activities, specifically forgery, fraudulent practices and presenting checks for deposit which he knew he had no right to possess or to maintain control over, Interchange has been damaged. Interchange's damage here is the amount for which it was held liable for conversion pursuant to N.J.S.A. 12A:3-419 in the Great American suit for accepting checks for deposit which did not bear the proper endorsement of the named payee.
The issue is whether the damages suffered by Interchange were "proximately caused" by any actions attributable to Trico. There is no state decisional law on this aspect of civil RICO law. Therefore, parallel federal case law is an appropriate reference source to interpret the RICO statute. Matter of Liquidation of Integrity Ins. Co., 245 N.J. Super. 133, 134-35, 584 A.2d 286 (Law Div. 1990) ("in the absence of state law or decisions, federal case law may be used to interpret New Jersey's RICO statute").
The section of the New Jersey RICO statute that confers a right of private action provides that:

*178 [a]ny person damaged in his business or property by reason of a violation of N.J.S. 2C:41-2 may sue therefore in any appropriate court and shall recover threefold any damages he sustains and the cost of suit, including a reasonable attorney's fee, costs of investigation and litigation.
[N.J.S.A. 2C:41-4(c)]
The crucial predicate RICO acts alleged by Interchange are repeated acts of forgery and fraudulent practices in violation of N.J.S.A. 2C:21-1, et seq., as incorporated into N.J.S.A. 2C:41-2, engaged in by Robert Utter on behalf of the enterprise. As noted earlier, for the purpose of this analysis we assume that Interchange's allegations of the predicate RICO acts and conspiracy are true.
In order to establish standing to institute a civil action under RICO, it must be shown that "plaintiff's harm was proximately caused by the RICO predicate acts alleged, i.e. that there was a direct relationship between plaintiff's injury and defendant's conduct." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (quoting Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.P., 985 F.2d 102, 104 (2d Cir.1993)). This requires a showing not only that the defendant's alleged RICO violation was the "but for" cause or cause-in-fact of his injury, but also that the violation was the legal or proximate cause. Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265, 112 S.Ct. 1311, 1316-1318, 117 L.Ed.2d 532, 543 (1992).
In Holmes, the Supreme Court addressed civil RICO standing in the context of causation. Plaintiff, Securities Investor Protection Corp. ("SIPC"), claimed that defendant Holmes conspired with others in a stock manipulation scheme that resulted in two broker-dealers being unable to meet their obligations to their customers. As a result of the dealers' insolvency, SIPC's statutory duty to advance funds to reimburse the injured customers of the broker dealers was triggered. The Court rebuffed SIPC's attempt to recover under civil RICO on proximate cause grounds. Ibid. The Court reasoned that because SIPC's claim arose purely out of the dealers' general inability to meet customer obligations, *179 only the dealers' insolvency and not the underlying individual brokers' fraud could be considered the direct cause of the loss. Holmes, supra, 503 U.S. at 270-271, 112 S.Ct. at 1319, 117 L.Ed.2d at 546-547. Therefore, SIPC did not have standing to bring the RICO claim. Ibid.
According to the Court, although RICO could be read to require that a defendant's RICO violation be only a "but for" cause of plaintiff's injury in order to establish standing under § 1964, Congress did not intend the provision to be read so expansively. Holmes, supra, 503 U.S. at 258, 112 S.Ct. at 1316, 117 L.Ed.2d at 542-543. Instead, the Court adopted a proximate cause standard which it borrowed from federal antitrust law. One of the "central" elements of proximate cause under antitrust has been the directness of the relationship between "the injury asserted and the injurious conduct alleged." Holmes, supra, 503 U.S. at 259, 112 S.Ct. at 1314, 117 L.Ed.2d at 544; see Van Natta v. Di Staulo, 277 N.J. Super. 175, 179, 649 A.2d 399 (App.Div. 1994) (plaintiff lacked standing because the injury alleged was incidental and not direct enough under antitrust standing requirements of this state).
The Court relied upon the principles of proximate cause generally and stated:
The notion of proximate cause reflects ideas of what justice demands, or what is administratively possible and convenient.... Accordingly among the many shapes this concept took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm merely flowing from the misfortunes visited upon a person by the defendant's acts was generally said to stand too remote a distance to recover.

[Holmes, supra, 503 U.S. at 259, 112 S.Ct. at 1314, 117 L.Ed.2d at 544.]
The Court reasoned that "[a]llowing suits by those injured only indirectly would open the door to massive and complex damages litigation which would not only burden the courts but also undermine the effectiveness of treble damages suits." Id. 503 U.S. at 268, 112 S.Ct. at 1317-1318, 117 L.Ed.2d at 548 (citations omitted). The Court recognized that:
[T]he consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events ... and any attempt to impose responsibility *180 upon such a basis would result in infinite liability for all wrongful acts and would set society on edge and fill the courts with endless litigation.
[Id., 503 U.S. at 266, 112 S.Ct. at 1317, 117 L.Ed.2d at 543 n. 10.]
Finally, the Court anchored the civil RICO proximate cause requirement in the following three part rationale: (1) the less direct the injury the more difficult it is to ascertain the amount of damages attributable to the violation, as distinct from other independent factors; (2) recognition of indirect claims would force courts to adopt complicated rules to apportion damages among different levels of injury; and (3) the need to grapple with such problems is simply not justified by the general interest in deterring injurious conduct, because the directly injured victims can be relied upon to vindicate the law adequately as private attorney generals. Id. 503 U.S. at 269-270, 112 S.Ct. at 1318, 117 L.Ed.2d at 544-545 (citations omitted).
The Court therefore determined that, although the harm caused by the defendant's acts was insolvency for the broker-dealers leaving them unable to pay the customer's claims, the direct cause of the customers' injuries was the insolvency. Ibid. It was only the broker-dealers' insolvency that connected the defendant's acts to the losses suffered by the customers. Ibid. Consequently, while it appears that "but for" causation was present, and perhaps it was foreseeable that the customers would be injured, the direct relationship between the injury and the conduct was missing. Ibid.
In short, the "by reason of" language of RICO (N.J.S.A. 2C:41-4) entails an inquiry into whether a defendant's actions can be said to have proximately caused the plaintiff's injuries. In civil RICO cases where a plaintiff's standing to sue is at issue, the court must examine the chain of events to determine who was directly injured by the predicate RICO acts. If a plaintiff is harmed only in an indirect way by the predicate acts, the plaintiff does not have standing to pursue a RICO claim. Prudential Ins. Co. of America v. U.S. Gypsum Co., 828 F. Supp. 287, 296 (D.N.J. 1993).
*181 The case law following Holmes illustrates the narrow interpretation given to proximate cause in RICO claims. In Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993), the court dismissed a RICO action filed by a class of minorities and women subcontractors who alleged that the defendants, prime contractors, fraudulently obtained government contracts by misrepresenting the status of their minority subcontractors. There, plaintiffs claimed that they had suffered losses by not receiving subcontracts to which they were entitled. Id. at 1310. As a result of defendants' misrepresentation regarding their use of minority subcontractors, defendants were awarded government contracts that otherwise would have been awarded to the prime contractor who had already designated plaintiffs as its subcontractors. Ibid. The court rejected plaintiffs' argument, finding that although plaintiffs appeared to have established "but for" causation and the foreseeability of their injuries, they could not establish the proximate cause element of their RICO action. Id. at 1312. The court explained:
Assuming the bad conduct by [defendant] deprived the named prime contractors of specified projects, and that in turn foreseeably deprived the MBWE plaintiffs of the subcontracts, "but for" causation appears present. It is much more difficult to take the next step and determine that there exists a direct relationship between [defendant's] scheme and the plaintiff's failure to earn certain profits on the subcontracts. The direct harm in this case runs to the prime contractors. It was the intervening inability of the prime contractors to secure the contracts that was the direct cause of the plaintiffs' injuries. Under Holmes, the MBWE plaintiffs are missing the direct relationship needed to show [defendant] proximately caused their injuries.
[Id. at 1312]
Interchange's claim alleges that Utter's fraudulent scheme caused the bank to suffer damage. Under the Holmes proximate cause analysis, Interchange bears the burden of establishing that the actions of Utter were the proximate cause of its technical liability under N.J.S.A. 12A:3-419 in the Great American litigation. Even accepting Interchange's allegations of conspiracy as true, Interchange has failed to establish that Utter's fraud directly caused its liability in that case. While the alleged conspiracy may *182 have been the "but for" cause of the damage, and it was foreseeable that Interchange might suffer injury, the required nexus between the RICO acts and the injury is missing. There are two reasons for this conclusion.
First, Interchange has stipulated that:
No Interchange officer, employee (present or former) was ever threatened, coerced bribed, offered money, promised gifts or favors, or was otherwise improperly influenced in any way by ... [Utter, Veglia, Bravakis, Trico, or United Jersey] to cash or accept for deposit checks presented by [Utter].
It follows that because Utter in no way influenced Interchange to accept checks, (the basis for Interchange's liability in the Great American suit), Utter, through his own acts was not the direct cause of Interchange's damages. Rather, it was Interchange's employees' failure to observe their statutory duties that led to Interchange's eventual liability.
Secondly, as Justice Scalia noted in Holmes, supra, it is helpful to consider the nature of the underlying act in determining proximate cause. That case, as is this case, was one of fraudulent acts. The "general rule in fraud cases ... is that you are liable only to an intended victim." Matter of EDC, 930 F.2d 1275, 1279 (7th Cir.1991). The victim need not be the primary victim, only an intended victim. Ibid. Interchange has not established that it was the intended victim of the RICO conspiracy, or that the conspiracy was a direct cause of its injuries. Utter's acts of defalcating checks and depositing them into his accounts for his own use, directly injured First Central, Great American, other lienholders, mortgagees, and, in one instance, even Trico. Depending on the specific transaction, it was the customers and lenders that were the targets and intended victims of the alleged fraud. Interchange's damages were several steps removed from the predicate acts of fraud and forgery that Interchange alleges. In fact, Interchange's damages directly resulted from the Great American litigation in which it was held liable for honoring the fraudulently endorsed checks where it had the opportunity to set up statutory defenses and avoid liability for the full measure of the Utter victims' losses.
*183 Thus, because Interchange failed to establish that the alleged racketeering scheme was the proximate cause of its losses, Interchange lacks standing to sue Trico. Here as in Holmes, the link is "too remote" between the alleged racketeering activities and Interchange's statutory liability under N.J.S.A. 12A:3-419. Because Interchange failed to demonstrate a "direct relation between the injury asserted and injurious conduct" as required by Holmes, Judge Murphy properly entered summary judgment dismissing Interchange's RICO claim against Trico.

II
The second issue on appeal is whether Interchange, acting as the drawee, depository and collecting bank on a check that was stolen, improperly endorsed, and deposited into an account at Interchange, maintained by Utter, is liable to Trico as the payee on the check for statutory conversion under N.J.S.A. 12A:3-419.
The court below held Interchange strictly liable to Trico for the face amount of the check, plus interest from the date of the defalcation in accordance with R. 4:42-11.
Judge Murphy set forth the undisputed facts upon which he relied. First, Thomas P. Zullo, an employee of Equishare, drew the check payable to Trico in the amount of $119,820.58 from his attorney trust account at Interchange. Second, Zullo placed the check in an envelope with a cover letter dated February 2, 1989 and addressed to Trico Mortgage Company. The letter read as follows:
Re: McCarthy, Brian  Loan No. 1200744.
Gentlemen, In the above captioned matter I have enclosed my trust check in the sum of $119,820.58 representing payment of mortgage delinquency and interest to February 5, 1989. Please endorse the original mortgage for cancellation and forward to me for recording.
Very Truly Yours, Thomas P. Zullo.
Third, Zullo testified at deposition that he placed that envelope in an out box under the control of Utter at First Central to be specifically carried to Trico. Fourth, the check was intended to pay off a mortgage held by Trico securing a note for a loan made *184 to Brian McCarthy. Fifth, the check was deposited in the account of Rochelle Title Agency at Interchange. Finally, the check was not endorsed by or on behalf of Trico, but rather is one of the checks unlawfully diverted by Robert Utter.
Based upon these undisputed findings, Judge Murphy went on to hold that:
When Check No. 1262 was honored by the bank, which was both drawee and collecting depository bank without Trico's endorsement there was a common law conversion of funds.... Once the check had been constructively delivered to Trico, its ownership rights vested and Trico had standing to sue as payee. In this case Trico has at the very least demonstrated a prima facie right to partial summary judgment on the 4th count of the counterclaim.
Interchange State Bank has failed to come forward with competent evidential material to show a genuine factual dispute.
Accordingly, I find that Interchange State Bank is liable to Trico Mortgage Company, Inc. for common law conversion of the proceeds for honoring Check No. 1262 on February 3, 1989 without Trico's endorsement.
Interchange raises two issues on appeal. First, it alleges that the trial court improperly found it strictly liable because a payee may not maintain an action for conversion when the check has never been delivered to the payee. Interchange contends that delivery was never made to Trico either constructively or in fact, and therefore Trico has no standing to assert the U.C.C. claim. Second, Interchange alleges that the question of whether there was delivery is at least a triable issue of fact that should preclude the entry of summary judgment.
With respect to the first argument, Interchange relies heavily upon the revision of N.J.S.A. 12A:3-420, recently enacted by the Legislature. Essentially, L. 1995, ch. 28, § 1 repealed and replaced N.J.S.A. 12A:3-101 through 3-805. Thus, N.J.S.A. 12A:3-419, under which this case was decided in the trial court, was repealed and that section was replaced by a new provision, N.J.S.A. 12A:3-420, which now provides in pertinent part:
a. The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not *185 be brought by the issuer or acceptor of the instrument or a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee. (emphasis added).
Interchange contends that the check issued by Zullo, payable to Trico as the payee, was not delivered as required by the provisions of the new statute. We decline to apply the statute retroactively inasmuch as there is no indication that the Legislature intended that effect. Twiss v. State, Dept. of Treasury, 124 N.J. 461, 466-470, 591 A.2d 913 (1991). Arguably, the new statute changes established case law on the issue of delivery as a prerequisite for a payee to institute an action for conversion, as will be seen later in this discussion. Thus, to apply the new statute retroactively would be unfair to both Zullo and Trico who apparently acted in reliance upon the law extant at the time.
N.J.S.A. 12A:3-419, in effect at the time did not contain a delivery requirement on its face. Instead it provided in pertinent part:
(1) An instrument is converted when
(a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or
(b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or
(c) it is paid on a forged indorsement.

(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of the liability is presumed to be the face amount of the instrument.
[N.J.S.A. 12A:3-419 (emphasis added).]
New Jersey courts had held that under N.J.S.A. 12A:3-419, a payee can recover in conversion from a depository bank for its payment of a check on a forged endorsement. Nutt v. Chemical Bank, 231 N.J. Super. 57, 62-63, 555 A.2d 8 (App.Div. 1989). The "statute creates an absolute right to recover in favor of plaintiffs [payees] upon proof that the draft was paid on the forged instruments." Gast v. American Cas. Co. of Reading, Pa., 99 N.J. Super. 538, 541, 240 A.2d 682 (App.Div. 1968). Further, courts had found no difference between payment of an instrument on a forged endorsement and on no endorsement by the payee at all. Humberto *186 Decorators, Inc. v. Plaza Nat'l Bank, 180 N.J. Super. 170, 175, 434 A.2d 618 (App.Div. 1981). In Gast, we cited comment 3 to help interpret N.J.S.A. 12A:3-419:
Subsection (1)(c) is new. It adopts the prevailing view of decisions holding that payment on a forged indorsement is not an acceptance, but that even though made in good faith, is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion.
The one case in New Jersey law that mentioned a delivery requirement for standing to bring a conversion action under N.J.S.A. 12A:3-419, and upon which Interchange relies, is Humberto Decorators, supra. However, in that case we did not hold that there was a strict delivery requirement for standing. 180 N.J. Super. at 175, 434 A.2d 618. In Humberto Decorators, the defendant bank had argued that plaintiff lacked standing to bring a conversion action because it could not prove delivery. Ibid. We responded to that assertion by finding that the plaintiff had vested ownership rights in the check sufficient to establish standing through constructive delivery. Ibid. The bank had physically given a cashier's check, made payable to plaintiff, to the borrower for the purpose of turning it over to the plaintiff. Id. at 173, 434 A.2d 618. The borrower, however, deposited the check into his own account. Ibid. Despite the fact that plaintiff never physically received the check, we held that the plaintiff's ownership rights had vested through constructive delivery because the parties intended to transfer title to the stolen instrument. Ibid. Accordingly, in determining whether a payee may recover for conversion, relevant decisional law at the time this case was decided did not require actual delivery of the instrument. See also Salsman v. National Community Bank of Rutherford, 102 N.J. Super. 482, 495, 246 A.2d 162 (Law Div. 1968), aff'd, 105 N.J. Super. 164, 251 A.2d 460 (App.Div. 1969); and Nutt, supra, 231 N.J. Super. at 62, 555 A.2d 8 (no mention at all of delivery requirement or the vesting of ownership rights for standing in conversion claim).
In this case, Trico as payee, had a vested ownership right in Check No. 1262, and therefore had standing to sue for conversion under N.J.S.A. 12A:3-419. The undisputed evidence upon which *187 Judge Murphy relied is that Zullo made out the check to Trico and surrendered control over the check by placing it in the out pile with the understanding that Utter would take the check to Trico. Moreover, the cover letter transmitting the check to Trico shows Zullo's intention to transfer title of the check to Trico.
Interchange cites Judge Murphy's language in his bench opinion and argues that, if the Judge's factual determination is correct, he wrongly granted summary judgment. Judge Murphy stated:
It cannot be disputed that Zullo surrendered control of the check and when Utter took possession of the stamped envelope containing the check and letter of transmittal Utter was acting as the agent of the payer.

[(emphasis added).]
Interchange seizes upon the word "payer" and argues that Judge Murphy held that Utter was an agent of Zullo and therefore Zullo never surrendered title to Trico. However, Interchange takes this word out of the context of the sentence as well as out of the context of the rest of the opinion. As set forth above, it is clear that Judge Murphy found that Zullo intended to transfer the check to Trico, and surrendered control over it. Zullo executed the check and the letter, sealed the envelope, and gave it to Utter intending that it be delivered to Trico. These facts parallel those of Humberto Decorators, supra, where constructive delivery was found. Consequently we reject Interchange's argument and hold that Judge Murphy correctly applied New Jersey law as it then stood.
On appeal, Interchange raises defenses under N.J.S.A. 12A:3-406 and the common law.[6] Interchange contends that it acted in a commercially reasonable manner and therefore has a *188 defense under the statute. The argument fails as a matter of law. Recently, in Martin Glennon v. First Fidelity, 279 N.J. Super. 48, 652 A.2d 199 (App.Div.), certif. granted, 141 N.J. 95, 660 A.2d 1194 (1995), we held that a bank's action of allowing a bookkeeper to deposit checks clearly made payable to a corporation into a personal account and then allowing him to withdraw the funds, was a clear violation of established law, and could not be found to have been in accordance with reasonable commercial standards applicable to the bank's business. Id. at 57, 652 A.2d 199. It follows that Interchange has no defense under N.J.S.A. 12A:3-406.
Additionally, Interchange cannot rely upon any common law defenses to avoid its strict liability under N.J.S.A. 12A:3-419. First, it should be noted that, despite its assertion to the contrary, Interchange has asserted common law defenses for the first time on appeal. Therefore, we need not address the issue. Nieder v. Royal Indemnity Insurance Co., 62 N.J. 229, 234, 300 A.2d 142 (1973) ("It is well settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court."). Nonetheless, the argument is without merit. Under N.J.S.A. 12A:3-419, Interchange is strictly liable to Trico for conversion, and cannot look to defenses that contravene statutory standards. See, Martin Glennon, supra, 279 N.J. Super at 57, 652 A.2d 199.
In its reply brief, Interchange raises the issue of the method by which prejudgment interest was calculated for the first time. Interchange alleges that prejudgment interest on the conversion claim should run from September 24, 1992, the date of filing, and not from February 3, 1989, the date of the conversion of the check. To raise this issue initially in a reply brief is improper. Warren Tp. v. Suffness, 225 N.J. Super. 399, 412, 542 A.2d 931 (App.Div.), certif. denied, 113 N.J. 640, 552 A.2d 166 (1988). We, therefore, decline to consider it.

III
Interchange also alleges for the first time on appeal that the entire controversy doctrine bars Trico's U.C.C. claim in the within *189 proceeding. According to Interchange, Trico should have asserted its claim during the Great American action, and therefore, must now be barred from making a claim in the present case. Although Interchange filed a motion for summary judgment at the trial level, it failed to raise the entire controversy defense.
In any event, we note that Judge Murphy entered an order in the Great American case excepting Interchange's claims against Trico from the mandatory joinder rule of the entire controversy doctrine when he denied its motion to amend its counter and crossclaims to include Trico on the eve of trial. Further, Trico was never a full-fledged party to the Great American action, and merely participated in that action in a limited capacity for purposes of discovery only. According to Trico, the theory behind this limited joinder was that Trico, as holder of the mortgage loans affected by Utter's defalcations, had been sued by a number of borrowers on those loans in various satellite cases. Rather than repeat the discovery in each of the satellite cases, Judge Murphy consolidated those actions for the purposes of discovery.
"The entire controversy doctrine requires a party to an action to assert all claims which he or she may have against any other party in order to preserve the claims." Burrell v. Quaranta, 259 N.J. Super. 243, 248, 612 A.2d 379 (App.Div. 1992) (citing Cogdell v. Hospital Center, 116 N.J. 7, 15, 560 A.2d 1169 (1989)). Generally the goals behind the entire controversy doctrine are judicial economy, administrative efficiency, fairness to litigants and the final disposition of related claims by the avoidance of piecemeal litigation. Cogdell, supra, 116 N.J. at 15, 560 A.2d 1169. Despite the far reaching nature of the entire controversy doctrine, New Jersey courts repeatedly have emphasized that the polestar for the application of the doctrine is "Judicial fairness." As recently explained in Cafferata v. Peyser, 251 N.J. Super. 256, 597 A.2d 1101 (App.Div. 1991):
The [entire controversy doctrine] is equitable in nature and is fundamentally predicated upon `judicial fairness and will be invoked in that spirit.' Thus, as in the case of all other preclusionary doctrines, its application requires, as a matter of first principle, that the party whose claim is being sought to be barred must have *190 had a fair and reasonable opportunity to have fully litigated that claim in the original action.
[Id. at 261, 597 A.2d 1101 (citations omitted).]
The entire controversy doctrine does not bar Trico's counterclaim here. Trico was never a true party to the Great American litigation and no claims were asserted against it therein. Further, it is likely that Judge Murphy would have rejected any attempt for Trico to join the Great American litigation to assert its claim inasmuch as he rejected Interchange's motion. Finally, since Judge Murphy presided over both the Great American action and the one at hand, he could have joined the actions if he felt it necessary. See Brown v. Brown, 208 N.J. Super. 372, 382, 506 A.2d (App.Div. 1986) (whether a claim should be joined in a subject action or reserved for another proceeding is a matter of judicial discretion.). In any event, as a matter of equity it would be unjust to allow Interchange to bring its claims despite their connection to the Great American action, but disallow Trico's claims.
Affirmed.
NOTES
[1] The second action was filed September 17, 1992, and sought indemnification and contribution and is captioned Interchange State Bank v. Veglia et als., Docket No. BER-L-10822-92.
[2] First Central and Great American obtained judgment against Interchange for approximately $311,000 in damages. That decision was appealed, however the parties settled prior to argument in the Appellate Division. The Appellate Division order reflecting that event states that all judgments against Interchange have been vacated. We do not rely on that order in arriving at our conclusion here.
[3] Interchange has not appealed from the dismissal of the negligent supervision claim of its amended complaint.
[4] Defendants William Bravakis and Gerald Veglia joined Trico in this motion. Consequently, they were also granted summary judgment on this count.
[5] Interchange also argues that the trial court incorrectly relied upon Trico's assertion that Interchange's own negligence caused its harm. However, the trial court did not base its decision to grant summary judgment on this issue. Instead Judge Murphy focused completely on whether acts attributable to Trico were the proximate cause of Interchange's injuries under a RICO analysis. Because Interchange's argument is based upon what it labels the "implications" of Trico's position, and not upon the true basis of the trial court decision, we focus solely on the proximate cause issue.
[6] N.J.S.A. 12A:3-406 provides:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawer or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.