**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1370-18T4

A.T.M.,[1]

    Plaintiff-Appellant,

v.

S.M.,

    Defendant-Respondent.

_____

Argued October 15, 2020 – Decided November 10, 2020

Before Judges Alvarez and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0540-16.

Peter Ventrice argued the cause for appellant (Brause, Brause & Ventrice LLC, attorneys; Peter Ventrice and Pamela L. Brause, on the briefs).

Patricia Garity Smits argued the cause for respondent.

---

[1] We use initials to identify the parties and their children in accordance with Rule 1:38-3(d)(10).

PER CURIAM

Plaintiff A.T.M. appeals from an October 19, 2018 final judgment of divorce (FJOD) granted to defendant-counterclaimant S.M. following a default hearing. We vacate the judgment and remand for further proceedings.

We discern the following facts from the record. The parties were married in Pakistan on September 14, 1991. Defendant worked as a physician in Pakistan until he emigrated to the United States in July 1992. Meanwhile, plaintiff remained in Pakistan but soon moved to live with her parents in England.

In September 1993, the parties had their first child, U.S., who was born in England. In January 1994, plaintiff and U.S. moved to the United States to live with defendant. [2] Two other children were also born of the marriage.

In July 1993, defendant began his medical career in the United States with an internship and residency in internal medicine at Jersey City Medical Center, which he completed in June 1996. From July 1996 until August 1998, defendant worked for another physician's practice. Following this, he started his own practice in Jersey City and worked as a primary care provider. At that time, plaintiff worked with defendant as a full-time office manager.

_____

[2] Both plaintiff and defendant currently have dual citizenship in Pakistan and the United States while plaintiff also possesses citizenship in the United Kingdom.

A-1370-18T4

2

Defendant described his marriage as "very difficult . . . right from [the] first month."  For instance, he testified about several incidents of domestic violence beginning in November 1999.  Defendant filed five domestic violence complaints against plaintiff from June 2003 to September 2012.  Plaintiff filed a domestic violence complaint against defendant in 2003.  A final restraining order under the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35, was entered in defendant's favor in March 2012.  It was dismissed about six weeks later.

In April 2004, defendant filed for divorce but later voluntarily dismissed the complaint.  The parties remained married and entered into an August 12, 2004 consent order, which provided that plaintiff would no longer be involved in defendant's medical practice, defendant would pay plaintiff $5000 per month for personal expenses, and defendant would also pay the mortgage on one of their homes along with certain utility bills.  At that point, defendant blocked plaintiff's access to his personal checking accounts and credit cards while also forbidding her from handling any financial transactions at his medical office.

Defendant testified that from 2009 to 2015, plaintiff spent much of her time in Pakistan, putting constant pressure on him because he alone cared for the children.  At the same time, the parties were purchasing numerous

investment properties in the United States and Pakistan.  Defendant explained he was "under constant financial demand from [plaintiff] to send more money" for a home construction project she undertook in Pakistan.

On November 12, 2015, plaintiff filed the complaint in this matter.  The complaint sought a divorce based on alleged irreconcilable differences, extreme mental and physical cruelty, and adultery.  It also alleged a cause of action for intentional infliction of emotion distress that sought compensatory damages, punitive damages, and injunctive relief.

In January 2016, defendant filed an answer and counterclaim for divorce based on irreconcilable differences and extreme cruelty.  The counterclaim also included alleged causes for assault and battery and intentional infliction of emotional distress.

A February 19, 2016 consent order resolved certain pendente lite issues, including defendant's agreement to continue paying:  (1) plaintiff non-taxable support of $5000 per month; (2) monthly stipends to their three children; (3) the automobile insurance on the three family vehicles; (4) the health insurance premiums for plaintiff and the three children; (5) the automobile loan installments on the three family vehicles; and (6) the mortgage, utilities, association dues, taxes, repairs, and maintenance on the marital home and the other real estate owned by the parties in the United States and Pakistan.

Defendant also agreed to be responsible for advancing the retainers for all jointly appointed or court-appointed neutral experts, including real estate appraisers and forensic experts. The order further provided that the marital tort claims pleaded by plaintiff and defendant were dismissed with prejudice. The parties reserved the right to seek counsel fees and deemed the $15,000 advanced by defendant to plaintiff's counsel to be payment of counsel fees without prejudice to subsequent reallocation. All other rights not expressly addressed in the consent order were also reserved.

Ten months later, the parties entered into an October 24, 2016 consent order that resolved all issues of the equitable distribution of all jointly owned real estate except the properties located in Pakistan. Meanwhile, the court entered several case management orders setting discovery deadlines, including dates for the completion of appraisals and expert reports.

In October 2017, the trial court appointed a retired judge as a special master to oversee discovery. The special master found extensive deficiencies in plaintiff's discovery responses.

In early 2018, plaintiff moved back to Pakistan and did not provide her family with an address or contact information. U.S. testified that she was only able to communicate with plaintiff through WhatsApp Messenger service.

A May 7, 2018 pre-trial order set a trial date of September 17 to September 28, 2018 and stated there would be "No Adjournments." The order noted the following issues remained outstanding: spousal support; marital torts; child support and education expenses; equitable distribution of defendant's medical practice and the property in Pakistan; and "[d]issipation of assets (which may include embezzlement, and forgery but not . . . punitive damages)."

On May 31, 2018, plaintiff signed a substitution of attorney allowing counsel to withdraw with plaintiff proceeding pro se. Although plaintiff now claims she did not do so voluntarily because of the medication she was taking, plaintiff did not move to set aside the substitution of attorney.

On June 26, 2018, plaintiff wrote to the court from Pakistan requesting an adjournment of her upcoming trial until November. Plaintiff stated she was representing herself, had fallen ill, was on bed rest, and "may have to undergo surgery and certain post-operative treatment as well." She also stated that her physician "advised [her] against travelling for at least [thirty] days" but noted she had been released from the hospital. Plaintiff indicated she did not want to disclose the nature of her illness. She promised to "keep the court updated of [her] medical condition" but did not do so.

The letter further indicated that plaintiff was forced to intervene in litigation filed by defendant's brother against defendant in Pakistan, which she claimed was frivolous and based on false allegations. Plaintiff alleged that "[d]efendant and his brother [were] conspiring to deprive [her] of [her] share of [their] marital [p]roperty in Pakistan." She claimed defendant did not oppose "his brother's false claims in Pakistan because his intent [was] to avoid paying [her her] share of the Pakistan [p]roperty." Plaintiff also claimed defendant filed a fraudulent deed in Pakistan. Plaintiff later informed the court that she would be arrested if she left Pakistan.

In response to plaintiff's letter, the court conducted a case management conference in the presence of defense counsel and defendant but without plaintiff being present. Defendant objected to plaintiff's counsel withdrawing from the case without obtaining the court's permission and questioned whether plaintiff's decision to allow her counsel to withdraw was voluntary considering her illness and the fact that she was in Pakistan. The court was unable to reach plaintiff by telephone. The court nevertheless issued a July 6, 2018 case management order requiring plaintiff to provide documentation verifying her medical condition to the court by July 20, 2018. Plaintiff was directed to provide a physician's report concerning her present condition, including her present diagnosis, prognosis, dates of treatment, dates of hospitalization, any

restrictions on travel, and any restrictions on participating in the legal process including trial. The order further directed plaintiff to immediately call the judge's chambers. The court emailed the order to plaintiff. Plaintiff did not make further direct contact with the court until over two months later.

On September 19, 2018, the first day of trial, the court commented that this was a "contentious," and "very problematic case" involving frequent motion practice, the appointment of a discovery master, and properties and lawsuits in Pakistan, including a divorce action.

At the start of the trial, the court noted that plaintiff was absent from the courtroom and had not complied with its July 6, 2018 order. Accordingly, it entered default against plaintiff for failure to prosecute her action. The following day, plaintiff contacted the court by phone and explained the reason for her absence. She stated that "the judge in Pakistan told [her she] can't leave the country until [the litigation is] resolved." As to her medical condition and failure to contact the court, plaintiff stated: "I was in the hospital. I couldn't talk. I had a mask on my face. I [had] shortness of breath. I was fainted and couldn't remember where I was. So, you know, I was in a hospital and I was bleeding to death." Plaintiff also claimed she had a fever and could not move.

A-1370-18T4

Although the court did not adjourn the trial or suspend its previous entry of default, it did permit plaintiff, who was still pro se, to participate in the default hearing by telephone. Plaintiff protested, stating she did not "know about the law," needed to have a lawyer but did not have one, and was "not in America to find one." The court did not find her testimony to be credible.

During the default hearing, the court heard testimony from defendant, U.S., and Anthony Franchini, the Vice-President for TD Bank in Warren. A central issue in the case was the value of defendant's medical practice. The parties jointly retained Withum Smith & Brown, P.C. (Withum) as a forensic accounting expert to value the medical practice and to trace certain funds from 2012 to 2015.

Thomas J. Reck, CPA/ABV, CFF, a partner at Withum, issued the final valuation report in April 2018. It valued the medical practice at $506,000. Reck's report also confirmed plaintiff deposited—and had U.S.[3] or another

---

[3] U.S. testified that, between the ages of fourteen to twenty-one, she "personally witnessed [plaintiff take] checks from [defendant's] business, hid[e] them from him and, thereafter, deposit[] the checks into her personal TD banking account." At plaintiff's behest, she would "intercept these checks," hide them in her room, and deposit them into plaintiff's bank account when necessary. U.S. stated that she stopped this practice around December 2014. During cross-examination, plaintiff insinuated that she had defendant's permission to deposit the checks in this fashion and that U.S. was depositing the checks into her own account, separate from plaintiff's. Plaintiff maintained that she did not dissipate marital funds.

unknown person deposit—insurance checks and fees totaling $375,856 from defendant's medical practice into her personal account at TD bank between 2012 and 2015. Plaintiff denied that she stole from her husband's medical practice. Without conducting voir dire, the court qualified Reck as an expert in forensic accounting and admitted his report into evidence without requiring him to testify.

On October 19, 2018, the trial judge issued an oral decision and entered a default judgment of divorce. The judgment provided that the October 24, 2016 consent order "remains in place and the division of properties set forth in that [o]rder remain[s] unchanged." Among other things, the court: (1) found that plaintiff would not receive a share of defendant's medical practice because the marital funds she dissipated exceeded her interest in that asset; (2) permitted defendant to bring separate claims against plaintiff for other funds she allegedly dissipated; (3) required defendant to pay plaintiff alimony of $5000 per month for eighteen months pending further financial documents from plaintiff; (4) equally divided the parties' respective pension funds; (5) awarded defendant credits totaling $598,237 to be deducted from plaintiff's share of the net proceeds of the sale of the Islamabad house; (6) declared defendant solely responsible for the support of the children; (7) declared defendant solely responsible for the parties' 2016 and 2017 federal and state

income taxes and any interest and penalties owed on the parties' 2015, 2016, and 2017 federal and state income taxes; and (8) determined the property purchased by defendant in Attuk, Pakistan prior to the marriage was not subject to equitable distribution. The judgment permitted defendant to pursue a Law Division action to "recover from the plaintiff any funds she diverted from his medical practice before January 1, 2012." It also permitted defendant to pursue an action against plaintiff "in New Jersey or Pakistan to recover . . . funds that were provided to her to purchase the Islamabad property in 2002[,] which she diverted for her own use." This appeal followed.

Plaintiff presents the following points for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S ADJOURNMENT REQUEST AND BY PROCEEDING BY WAY OF A DEFAULT HEARING.
>
> POINT II
>
> THE TRIAL COURT'S DETERMINATION THAT PLAINTIFF FORFEITED ANY INTEREST IN DEFENDANT'S MEDICAL PRACTICE, COMBINED WITH THE TRIAL COURT'S GRANTING DEFENDANT PERMISSION TO PURSUE ADDITIONAL CAUSES OF ACTION AGAINST PLAINTIFF IN THE LAW DIVISION IN NEW JERSEY AND IN PAKISTAN, RESULTED IN AN UNFAIR AND INEQUITABLE DISTRIBUTION OF MARITAL ASSETS AND WAS UNDULY PUNITIVE TO PLAINTIFF.

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION
BY AWARDING PLAINTIFF ALIMONY OF ONLY
$5,000.00 PER MONTH FOR A TERM OF 18
MONTHS AND BY REQUIRING PLAINTIFF TO
FILE A POST-JUDGMENT MOTION TO SEEK
ADDITIONAL ALIMONY DURING THOSE 18
MONTHS BUT ONLY IF PLAINTIFF COMPLIED
WITH CERTAIN CONDITIONS.

Appellate review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). Appellate courts "accord particular deference to the Family Part because of its 'special jurisdiction and expertise in family matters.'" Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 413). Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Appellate courts will not disturb the trial court's factual findings and legal conclusions unless convinced they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015)).

"Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred." Ibid. (citing Gac v. Gac, 186 N.J. 535, 547 (2006)). An abuse of discretion occurs when a trial court's decision "rested on an impermissible basis, considered irrelevant or inappropriate factors, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Elrom, 439 N.J. Super. at 434 (citations and internal quotation marks omitted).

I.

Plaintiff argues the trial court erred by admitting the forensic accountant's valuation report that valued defendant's medical practice into evidence at the default hearing without the accountant testifying and being subject to cross-examination. We agree.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" State v. Branch, 182 N.J. 338, 357 (2005) (quoting N.J.R.E. 801(c)). "Hearsay is inadmissible unless it falls within one or more of the exceptions enumerated in our evidence rules." State ex rel. J.A., 195 N.J. 324, 336 (2008) (citing Branch, 182 N.J. at 357).

Expert reports "are hearsay and generally are not admissible." Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117, 126 (App. Div. 1998) (citing

Hill v. Cochran, 175 N.J. Super. 542, 546-47 (App. Div. 1980)). A non-testifying expert's opinion constitutes inadmissible hearsay.[4] Brun v. Cardoso, 390 N.J. Super. 409, 422 (App. Div. 2006). Admission of a non-testifying expert's report deprives the opposing party "of the ability to cross-examine the author of the report on [a] central issue of the case." Ibid.

The valuation report was hearsay offered to prove the truth of its contents. The report does not fall within any hearsay exception enumerated in N.J.R.E. 803. Admission of the report provided the basis for the court's determination of the value of defendant's medical practice and its conclusion that "plaintiff has forfeited any interest in that asset as there is credible evidence that she diverted funds from the medical practice during the years 2012 through 2015" because the marital funds she dissipated exceeded her interest in that asset.

The forensic accountant valued the medical practice at $506,000. The practice started and prospered during the marriage. As such, it was an asset subject to equitable distribution. Plaintiff had worked at the practice as its

---

[4] Conversely, if Reck had testified and substantiated his findings, his report may have been admissible to assist the trial court. See Elrabie v. Borough of Franklin Lakes, 24 N.J. Tax 158, 163 n.1 (Tax 2008) (noting that "if an expert [appraiser] may testify then his or her report may be admitted into evidence to assist the court in evaluating the expert's testimony" (citing Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 280 (App. Div. 1998))).

full-time office manager. Without determining its value, the court could not have concluded that the marital funds dissipated by plaintiff exceeded her share of its value. Thus, the value of defendant's lucrative medical practice was critical evidence.

Reck, who authored the valuation report, did not appear for trial or testify at the default hearing. Without explicitly qualifying Reck as an expert under N.J.R.E. 702, the court stated, "I do [not] see any reason without anybody here to cross-examine Mr. Reck, what Mr. Reck would be called to do would be to . . . go through his report and come up with the conclusion that the practice is worth $506,000." The judge explained, "[t]he reason I state that is because I have looked at [the report] and there is nothing that jumps out at me" and "there is nobody here to challenge his findings

On October 15, 2018, while defendant was on direct examination, the court asked defense counsel whether she would be calling Reck. Defense counsel responded, "No, if your Honor will recall we asked that [the report] be admitted." The court then stated to plaintiff: "You have seen Mr. Reck's report. Do you have any objection to that being entered [into evidence]?" Plaintiff responded, "Yes, I do" and informed the court that she was "going to call Mr. Reck [to] the stand." However, plaintiff never called Reck to testify. This is hardly surprising since plaintiff was not permitted to present witnesses

at the default hearing.  Moreover, plaintiff had no way of knowing in advance that defendant would not produce Reck to testify.  As a result, his findings and conclusions were not subject to the rigors of cross-examination.

"Our legal system has long recognized that cross-examination is the 'greatest legal engine ever invented for the discovery of truth.'"  State v. Basil, 202 N.J. 570, 591 (2010) (quoting California v. Green, 399 U.S. 149, 158 (1970)).  Cross-examination of an expert is often a crucial element in determining the accuracy, reliability, and probative value of the expert's findings and opinions.  See State v. Martini, 131 N.J. 176, 264 (1993) ("To determine the credibility, weight and probative value of an expert's opinion, one must question the facts and reasoning on which it is based." (citing Johnson v. Salem Corp., 97 N.J. 78, 91 (1984))).  By admitting his report, the court accepted Reck's untested opinion of the value of this significant marital asset and the dissipation of assets.  The court relied heavily on the contents of the report and determined the value of the medical practice was $506,000, mirroring Reck's valuation.

We recognize that the parties jointly selected Withum as their forensic accountant.  They did not, however, agree to be bound by the Withum valuation.  Accordingly, they each retained the right to attack the accuracy of the valuation at trial.  By admitting Reck's report in evidence without requiring

him to testify and be subjected to cross-examination, the trial court effectively prevented plaintiff from questioning Reck regarding the facts relied upon by Reck, his method of valuation, and the accuracy of his conclusions. It also precluded plaintiff from cross-examining Reck on whether she dissipated funds from the medical practice.

Ordinarily, a defaulting party may cross-examine the witnesses called by their adversary during a proof hearing. See Chakravarti v. Pegasus Consulting Grp., Inc., 393 N.J. Super. 203, 210 (App. Div. 2007) ("Even though a defendant who has defaulted has relinquished the right to present affirmative proofs in the matter, the right to challenge a plaintiff's showings in a proof hearing by way of cross-examination and argument should not ordinarily be precluded."). This is designed to assist the trial judge in determining whether the proofs are "insufficient in law or fact to support the judgment which [defendant] seeks." Fox v. Fox, 76 N.J. Super. 600, 604 (Ch. Div. 1962).

Generally, "[e]videntiary decisions are reviewed under the abuse of discretion standard because . . . the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion. Est. of Hanges v. Metro. Prop. & Cas, Ins. Co., 202 N.J. 369, 383-384 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). If hearsay evidence is admitted without objection, however, we review for plain error; "that is, whether its

admission 'is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Frisby, 174 N.J. 583, 591 (2002) (quoting R. 2:10-2).

Reck's valuation report was inadmissible hearsay. Plaintiff objected to its admission in evidence. The trial court misplaced its discretion by admitting the report over plaintiff's objection. Indeed, we deem the admission of the report in evidence to be plain error. By relying on the findings and opinions expressed in the report, the court decided major issues in the case based solely on inadmissible hearsay. This error was "clearly capable of producing an unjust result." R. 2:10-2.

## II.

We next address the default entered against plaintiff and the disposition of this highly contested matrimonial action by way of default hearing without plaintiff being present or represented by counsel. Plaintiff argues the trial court erred in denying her adjournment request and by immediately proceeding with the default hearing when she did not physically appear in court on the first day of trial. She also contends it was error to proceed with the default hearing in the absence of service of a notice of proposed final judgment in the form and manner required by Rule 5:5-10 at least twenty days prior to the hearing. We agree.

A.

We first address the failure to serve a notice of proposed final judgment pursuant to Rule 5:5-10, which provides in part:

> In those cases where equitable distribution, alimony, child support and other relief are sought and a default has been entered, the plaintiff shall file and serve on the defaulting party, in accordance with R. 1:5-2, a Notice of Proposed Final Judgment ("Notice"), not less than 20 days prior to the hearing date. The Notice shall include the proposed trial date, a statement of the value of each asset and the amount of each debt sought to be distributed and a proposal for distribution, a statement as to whether plaintiff is seeking alimony and/or child support and, if so, in what amount, and a statement as to all other relief sought . . . .

The rule mandates that "the plaintiff must, at least 20 days prior to hearing, file and serve on the defaulting defendant a notice of application for relief with CIS annexed, specifying with particularity the claims made for alimony, child support, equitable distribution and other affirmative relief." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 5:5-10 (2021). The only exception is when "a written property settlement agreement has been executed." R. 5:5-10. That was not the case here.

In his counterclaims, defendant sought the following relief: (1) joint legal custody with defendant as parent of primary residence; (2) child support, including contribution to their children's college costs and extraordinary

expenses; (3) equitable distribution of their marital assets and debts; (4) an accounting of money spent to improve their real estate in Pakistan; (5) compensatory and punitive damages; and (6) and counsel fees and costs. The contents of the counterclaim did not satisfy the specific notice requirements of Rule 5:5-10.

During the default hearing defendant's counsel stated that her "trial memo would be almost the same as a proposed final judgment" and would satisfy Rule 5:5-10. The court agreed, finding defendant's trial memo thoroughly stated exactly what he sought and included "more information . . . than a proposed final judgment."

Defendant's pre-trial memorandum set forth the relief he sought. (Da388-430). Under other circumstances, this may have satisfied Rule 5:5-10 in spirit. However, the memorandum was emailed and mailed to plaintiff on September 10, 2018, and was not received by the court until September 14, 2018, only five days before the first day of trial. This hardly complied with the twenty-day notice required by Rule 5:5-10, and it was never confirmed that plaintiff received it.[5] Rule 5:5-10 requires that the defaulting party be served "in accordance with R. 1:5-2." That rule provides:

---

[5] Defense counsel stated that she sent the documents to plaintiff via email and by mailing physical copies to her last known address in Basking Ridge, but

> If no address is known [for a defaulting party], despite diligent effort, the filing of papers with the clerk shall be deemed to satisfy that service requirement and there need be no separate service upon the clerk . . . . The specific facts underlying the diligent effort required by this rule shall be recited in the proof of service required by R. 1:5-3.

Defendant possessed the specific facts necessary to fulfill his proof of service requirements outlined in Rule 1:5-3 but declined to do so.

Plaintiff asserts her due process rights were violated because defendant failed to serve her with a notice of proposed final judgment twenty days or more before the default hearing. She avers that the default judgment of divorce should "be vacated, and the matter should be remanded for a full trial on the merits on all issues." We agree that a notice of proposed final judgment was required.

The court entered default against plaintiff when she did not appear for the first day of trial. Defendant was then required to serve a notice of proposed judgment on plaintiff at least twenty days before the default hearing date. The default hearing should have been scheduled for a date to allow proper service of the notice of proposed final judgment. It was error to

_____

(continued)

their receipt was not acknowledged. It seems clear, however, that defendant knew plaintiff was residing in Pakistan. Notably, on August 2, 2018, the court found that defendant did not serve his application for an order to show cause on plaintiff.

proceed with the default hearing the next day. For this reason, we vacate the default judgment.

B.

We next address the entry of default against plaintiff on the first day of trial. We take into consideration that she was proceeding pro se and resided in Pakistan. We also note this was a first trial listing.

Plaintiff contends she was unable to appear for trial because she was too ill, bedridden, and was not permitted to leave Pakistan until the litigation filed by defendant's brother was completed. She further contends that she did not voluntarily agree to the withdrawal of her attorney and was thwarted from hiring new counsel due to her illness and residing in Pakistan.

We recognize that plaintiff did not move for leave to appear and testify by contemporaneous video transmission or telephonically. Nor did she fully provide the court-ordered written verification of her medical condition or inability to leave Pakistan due to the litigation filed there. However, on September 4, 2018, her attorney in Pakistan wrote to the court advising that plaintiff was still ill and unavailable and provided documentation information and pleadings regarding the litigation filed in Pakistan.

In a recent opinion, we recognized that "[o]ur court rules do not provide for testimony by way of contemporaneous video transmission, but they don't

prevent it either.  In fact, trial testimony may be presented in a number of ways that do not require the witness' physical presence."  Pathri v. Kakarlamath, 462 N.J. Super. 208, 212 (App. Div. 2020).  In State v. Santos, 210 N.J. 129 (2012), the Court considered the propriety of telephonic testimony at a post-conviction relief hearing.  It acknowledged the rules "do not expressly require" in-person testimony and do not "directly prohibit remote testimony by telephone." Id. at 139.

In Pathri, we distinguished telephonic testimony from testimony by contemporaneous video transmission.  We noted that in Aqua Marine Prods., Inc. v. Pathe Comput. Control Sys. Corp., 229 N.J. Super. 264, 274 (App. Div. 1988), we found that when a witness testifies telephonically, there was no way to ascertain the identity of the witness.  We also determined "there was no basis at all on which the indefinable and elusive indicia of credibility, denominated 'demeanor,' could be evaluated by the fact-finder." Ibid.  "Out of these concerns, we constructed a two-part test that would allow telephonic testimony only in 'special situations in which there is either exigency or consent and in which the witness' identity and credentials are known quantities.'" Pathri, 462 N.J. Super. at 213-14 (quoting Aqua Marine, 229 N.J. Super. at 274-75).

In determining whether to permit testimony by contemporaneous video transmission, we concluded that judges should consider the following factors: (1) "the severity of the factual dispute to which the witness will testify;" (2) "whether the factfinder is a judge or a jury;" (3) "the cost of requiring the witness' physical appearance in court versus the cost of transmitting the witness' testimony in some other form;" (4) "the delay caused by insisting on the witness' physical appearance in court versus the speed and convenience of allowing the transmission in some other manner;" (5) "whether the witness' inability to be present in court at the time of trial was foreseeable or preventable;" and (6) "the witness' difficulty in appearing in person." Id. at 216.

Several Pathri factors appear to militate against permitting plaintiff to appear by contemporaneous video transmission, much less telephonically. Plaintiff sought to testify about "sharply disputed question[s] of fact" that went "to the heart of the matter." Id. at 217. Plaintiff's expected testimony appeared aimed at presenting "a starkly different version of the relevant facts" concerning the alleged marital torts, including the dissipation of assets, and "the amount required to maintain a lifestyle." Ibid. Because that "testimony may be far more influential on the factfinder," and involved "an actual disagreement about the facts," live testimony was preferable because plaintiff's

A-1370-18T4

credibility and demeanor was at issue. Ibid. Accordingly, the judge would be "better served in [his] truth-finding function by having testimony in person rather than by contemporaneous video transmission." Id. at 217-18.

Plaintiff requested an adjournment of the trial until November. The requested "delay in the case's disposition is also a factor." Id. at 219. Although this was a first trial listing, the court noted this was one of the oldest cases on its matrimonial docket.

The court found that plaintiff did not credibly demonstrate her difficulty in appearing in court. It did so, however, based on plaintiff's written submissions and appearance by telephone.

Plaintiff's argument that the court did not advise her that default would be entered if she did not appear for trial is unpersuasive. The pre-trial order stated that there would be "No Adjournments." It was clearly a peremptory trial date. Additional notice that failure to appear may result in a default being entered was not required. We note, however, that the court did not respond to counsel's September 5, 2018 letter that stated plaintiff was still ill and unavailable. Nor did it respond to counsel's September 18, 2018 email.

Rule 1:2-4(a) sets forth a wide range of sanctions that a trial court may impose for a party's failure to appear on the day of trial without "just excuse." The trial court may impose one or more of the following sanctions: (a) the

payment of costs by the delinquent party to the court or the adverse party; (b) the payment of reasonable expenses, including attorney's fees, by the delinquent party to the adverse party; (c) the dismissal of the delinquent party's complaint; or (d) such other action that it deems appropriate.  R. 1:2-4(a). Accordingly, a failure to appear for a peremptory trial date without just excuse may, in certain circumstances, justify the dismissal of the party's pleadings and proceeding by way of default hearing.

That being said, trial courts "must remain mindful of Rule 1:1-2, which declares that the court rules are to be 'construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.'"  Pathri, 462 N.J. Super. at 220.  To that end, the Pathri factors "aid in determining whether the principles stated in Rule 1:1-2 . . . favor or disfavor allowing plaintiff to testify by contemporaneous video transmission."  Ibid.  As we recognized in Pathri:

> [I]n most cases, it would be hard to imagine that the fair application of these principles would lead to a trial that lacks a party's testimony rather than contains that testimony in a less than desirable form.  If a party is not permitted to testify by way of contemporaneous video transmission, and is unable to attend in person notwithstanding, the ruling could have the undesirable effect of turning the trial into a proof hearing in favor of the one party able to attend.  Judges, in the final analysis, should be wary of the impact such a ruling would have on the overall presentation of the proofs.

[Ibid.]

Procedural dismissals are not favored. Connors v. Sexton Studios, Inc., 270 N.J. Super. 390, 395 (App. Div. 1994). The ultimate sanction of dismissal with prejudice must be sparingly applied and only if lesser sanctions are unavailing. Rabboh v. Lamattina, 312 N.J. Super. 487, 492 (App. Div. 1998). When the plaintiff is unable to appear in a case in which her testimony is critical to the cause of action, sanctions other than dismissal should be considered. See Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 405-06 (2009) ("There are reasoned, intermediate steps between the outright dismissal of the complaint and allowing plaintiff's claims to go forward in his absence that should have been explored."). "Ordinarily, one or more of the lesser sanctions of [Rule 1:2-4(a)] would apply, namely, the payment of defendant's costs, attorney's fees and/or out-of-pocket costs for the first appearance." Connors, 270 N.J. Super. at 393.

Applying these principles, we conclude the trial court abused its discretion by entering default and proceeding by way of proof hearing in this matter.[6] Plaintiff resided half-way around the world in Pakistan. She was without counsel in this case and had no legal training. She asserted that she

---

[6] We fully recognize that the trial court did not have the benefit of our decision in Pathri, which was decided on January 23, 2020.

suffered from medical conditions that prevented her from appearing for trial in September.

Moreover, the controlling facts in this complicated case were vigorously disputed. Both spousal support and equitable distribution of valuable assets were at stake. This was a long-term marriage. The parties had widely disparate incomes. Testimony was needed to determine the appropriate amount of equitable distribution and spousal support necessary to maintain the marital lifestyle. In that regard, temporarily continuing the level of pendente lite spousal support for an additional eighteen months did not satisfy the court's obligation to hear the evidence, assess the pertinent factors, make findings of fact, and state its conclusions of law. R. 1:7-4(a).

We recognize that postponing the trial would have resulted in further aging of an already old case. The prompt disposal of cases is desirable. Audobon Vol. Fire Co. No. 1 v. Church Constr. Co., 206 N.J. Super. 405, 406 (App. Div. 1986). "But swift justice demands more than just swiftness." Connors, 270 N.J. Super. at 395 (quoting Henderson v. Bannan, 256 F.2d 363, 390 (6th Cir. 1958) (Stewart, J., dissenting)).

We vacate the default entered against plaintiff and remand for trial. Plaintiff may move to appear and testify by contemporaneous video transmission if she is still unable to appear in court in person due to her

A-1370-18T4

28

medical conditions. Any such application should be based on a fulsome presentation of the facts surrounding any claimed inability to appear for trial. Plaintiff's application should address all the Pathri factors, as should the court's ruling. We express no opinion on the merits of that future application. Either way, the case shall proceed to trial.

On remand, defendant may apply to the trial court for an award of reasonable expense, including attorney's fees, related to the default hearing, pursuant to Rule 1:2-4(a). We again express no opinion on the merits of any such application and leave that issue to the sound discretion of the trial court.

III.

We next address plaintiff's challenge of the temporary alimony award. The court determined that the limited record did not provide the necessary information to fashion a final decision on alimony and awarded temporary alimony subject to revision without the necessity of showing changed circumstances.

Plaintiff argues the trial abused its discretion by awarding her temporary alimony of $5000 per month for eighteen months, while directing her to file a post-judgment motion within that term if she sought additional alimony going forward. The amount and duration of any additional alimony would then be determined by the motion judge. However, if plaintiff did not move for

additional alimony before the expiration of eighteen months, defendant would have no further obligation to pay alimony.

Alimony awards are governed by N.J.S.A. 2A:34-23(b), which sets forth a list of non-exhaustive factors for a court to consider. "In all divorce proceedings, trial courts must 'consider and make specific findings' under N.J.S.A. 2A:34-23(b) when awarding alimony pursuant to a divorce decree." Crews v. Crews, 164 N.J. 11, 25 (2000) (quoting Carter v. Carter, 318 N.J. Super. 34, 42-43 (App. Div. 1999)).

The trial court prefaced its decision regarding alimony by stating that it did not know plaintiff's "exact economic circumstances" because she had "been out of the country for a significant period of time." The court explained that it had "no idea" and "could not state with any degree of reasonableness," "certainty," or "competence what it costs her to live every month in Pakistan, or if she's coming back to the United States." Seemingly exasperated, the judge stated that plaintiff's "needs are simply unknown."

The court found defendant's earning capacity as a physician was at least $500,000 or $600,000 a year, which "will continue for a substantial period of time." In stark contrast, the court did not find that plaintiff had any marketable skills, noting her only income since 2004 was from the medical practice. It noted there was no evidence "to suggest that she would be employable outside

of a family-run business." The court was unaware if there were any limitations on her ability to work in Pakistan.

Plaintiff was forty-four years old at the time of the default hearing. The court did not "see any great employment opportunities for her." It found plaintiff "contribute[d] to [defendant's] education, training or earning power because she stayed at home with the children and raised them." It further found she contributed "greatly as a homemaker."

On the other hand, the court found defendant proved that plaintiff diverted funds from the medical practice by taking checks made payable to the practice, including checks from insurance companies. But the court did not find "any credible proof as to the exact amount of money that was sent overseas [or] the amount used for marital purposes." The court also noted the Reck report did not analyze what the money was used for.

Alimony and equitable distribution are interrelated. See N.J.S.A. 2A:34-23(b)(10) (requiring the court to consider the equitable distribution awarded and any direct or indirect payouts on equitable distribution, when determining the type and amount of alimony); Conforti v. Guliadis, 128 N.J. 318, 324 (1992) (noting the intimate relationship of equitable distribution and support); Claffey v. Claffey, 360 N.J. Super. 240, 263 (App. Div. 2003) (noting the

"unquestionable interrelationship between alimony and equitable distribution").

The trial court also erred by concluding that going forward, the alimony awarded to plaintiff would not be taxable income for plaintiff and deductible by defendant. The default judgment was entered on October 19, 2018. Alimony is not deductible for the payor, nor included in gross income for the payee, on federal income taxes for final judgments of divorce executed after December 31, 2018, or "executed on or before such date and modified after such date if the modification expressly provides that the amendments made by this section apply to such modification." Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11051(b)-(c), 131 Stat. 2054, 2089-90 (2017). Moreover, the statute only applies to federal income taxes; it does not affect the taxation and deductibility of alimony as to state income taxes.

Because we are vacating the default judgment, the temporary alimony award is likewise vacated. Defendant shall remain obligated to remit spousal support of $5000 per month pending further court order or judgment.

IV.

We provide the following additional guidance to the trial court. Plaintiff argues the court erred when it: (1) "permitted defendant to pursue a separate action against plaintiff in the Law Division for other funds that plaintiff

allegedly diverted from the practice before 2012"; and (2) "permitted defendant to pursue yet additional causes of action in New Jersey or in Pakistan to recover other funds that plaintiff allegedly diverted for her own use dating back as far as 2002." She asserts that both rulings are barred by the Entire Controversy Doctrine.

"[T]he entire controversy doctrine requires the mandatory joinder of all claims to a single transaction." Oliver v. Ambrose, 152 N.J. 383, 392 (1998). The doctrine requires that claims stemming from the same "core set of facts" be "determined in one proceeding." DiTrolio v. Antiles, 142 N.J. 253, 267-68 (1995). "Consistent with these goals, Rule 4:30A provides a mechanism to prevent fragmentation of litigation." Oliver, 152 N.J. at 393. "Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims . . . ." R. 4:30A.

"The entire controversy doctrine encompasses 'virtually all causes, claims, and defenses relating to a controversy.'" Oliver, 152 N.J. at 394 (quoting Cogdellv. Hosp. Ctr. at Orange, 116 N.J. 7, 16 (1989)). "[T]he doctrine also includes counterclaims and cross-claims." Ibid. (citing Cogdell, 116 N.J. at 15).

"The entire controversy doctrine applies to family actions." Ibid. "[M]arital tort claims should be joined with dissolution proceedings because

the potential for money damages [is] relevant." Id. at 395 (citing Tevis v. Tevis, 79 N.J. 422, 434 (1979)). "Consequently, a marital tort is required to be joined with a pending family action involving the same parties." Pressler & Verniero, cmt. 4 on R. 5:1-2(a).

The trial court concluded it did not have the necessary competent proofs to decide whether plaintiff diverted monies earmarked for the purchase of property in Pakistan. It permitted defendant to bring suit in Pakistan or the United States on that claim. The court also permitted defendant to pursue his claim that plaintiff diverted monies from his medical practice prior to 2012 in a separate civil action in New Jersey.

The record does not reflect whether defendant pursued civil litigation against plaintiff over any disputed funds following their divorce. Defendant's medical practice sued plaintiff. The parties reached a settlement in that matter while on appeal. See [S.M.], M.D., P.C. v. [A.T.M.], No. A-5682-16 (App. Div. Mar. 25, 2019).

The remand court shall determine if defendant is personally pursuing any civil actions against plaintiff to recover dissipated or converted funds, and if so, whether defendant is precluded from pursuing those claims in separate civil actions.

Plaintiff also argues that an adjournment should have been granted because her attorney withdrew after the trial date had been scheduled without complying with Rule 1:11-2(a)(2). Plaintiff contends that to properly withdraw, her former attorney was required to obtain a "written waiver by all parties of notice" and file certifications stating that the withdrawal would not cause or result in delay. We disagree.

Rule 5:3-5(e) governs the withdrawal of an attorney from representation in Family Part cases. It states in part that "[a]n attorney may withdraw from representation ninety (90) days or more prior to the scheduled trial date on the client's consent in accordance with [Rule] 1:11-2(a)(1)." R. 5:3-5(e)(1).

On May 31, 2018, plaintiff and her counsel signed a substitution of attorney, allowing counsel to withdraw with plaintiff proceeding pro se. The substitution was filed on June 5, 2018, more than ninety days before the scheduled trial date. Accordingly, counsel was not required to meet the additional requirements imposed by Rule 5:3-5(e)(2).

Plaintiff further argues she did not sign the substitution voluntarily, claiming she was under the effect of numerous medications. The record does not reflect the medications plaintiff was prescribed or include an expert opinion that those medications affected her ability to consent to the withdrawal

knowingly and voluntarily. Moreover, plaintiff did not move to set aside the withdrawal of counsel. We also note that counsel continued to represent plaintiff in the civil action filed against her by defendant's medical practice. Plaintiff has not demonstrated that the withdrawal of counsel was improper.

In sum, we vacate the default and default judgment entered against plaintiff and remand for trial.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION